United States Court of Appeals
Fifth Circuit

**F I L E D**

November 25, 2003

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————————

No. 98-20255

————————————————

N.W. ENTERPRISES INCORPORATED; AMETHYST ENTERPRISES INC;
CAMPUS INVESTMENTS INCORPORATED; 1431 WEST 18TH, INC.,

Plaintiffs - Appellees,

FTU INC.; DAJO INC.; ICE EMBASSY INC.;
TEXAS RICHMOND CORPORATION; ANDREA STAFFORD; FRANK I. KENT;
NAOMI L. PARRISH; ANN MARIE HASSELBACH; JEANNE L GRIGSBY;
SUSAN BOYLE; DANA LYNN THOMAS; KIMBERLY ANN DUSHMAN;
MICHELLE HADLEY; COLLEEN CLOER; LEAH MARIE WILSON;
CARLA K. EATON; CHERYL THOMPSON; ROBERT G. FUREY; HFR
ENTERPRISES, INC.; ANDREA HILL; GINA OLIVER; HEATHER WELDIN;
CHARISMA BARRY; DONNA SOTO; ANDREA ALLBRIGHT MARCO; AHD HOUSTON
INC., a Texas Corporation d/b/a Centerfolds; DNW HOUSTON, INC;
PARABAR CO, doing business as Paradise Club;
JANE DOE ONE, Applicants; JANE DOE TWO, Applicants;
DEE & DEE ENTERPRISES, INC.; 9924 I-45 NORTH, INC.;
HI-HOUSTON, INC.; CHARLES WESLEY, INC.; CHIL SOUNG, INC.,
doing business as BJ's 24 Hour Newsstand; DARIS, INC., doing
business as Riveria Cabaret; GNCD, INC., doing business as
Fantasy South; RUDE DOG II, INC., doing business as Scores
Cabaret; LONE STARR MULTI THEATRES, INC., doing business as
Cinema West; AVW, INC., doing business as Adult Video Megaplexxx;
CLMS, INC., doing business as 24 Hour Video & News; C-SNAP, INC.,
doing business as Interludes; EAST BAY, INC., doing business as
East Tex 24 Hour News & Video, doing business as Hempstead Adult
Bookstore, none, doing business as XTC Cabaret Center; TNT
SERVICES, INC., doing business as Xcalibur; 9834 JENSEN, INC.,
doing business as Harlem Knights; 8503 NORTH FREEWAY, INC.,
doing business as Fantasy Cabaret; CORPORATE CLUBS OF TEXAS,
INC., doing business as Fantasia I XTC; US CLUBS, INC.,
doing business as Fantasia III XTC; XTC CABARET, INC., doing
business as XTC; DHL INC., doing business as Executive XTC;
CHERIE FELDMAN, doing business as Executive Playmates;
EVE ENTERPRISES, INC., doing business as Club Royale;
LONG TRAN, doing business as Ellington Newsstand;
NIEN X. NGUYEN, doing business as DT Video; WMF INVESTMENTS,
INC., doing business as Chesapeake Bay; AKM, INC., doing
business as Gigi's Cabaret; DHR, INC., doing business as Hi-10
Cabaret; PANAH, INC., doing business as Mirage Cabaret;
R & R ENTERTAINMENT, INC., doing business as Moments Cabaret;

SSD ENTERPRISES, INC., doing business as Ritz Cabaret; HHE, INC., doing business as Passion Cabaret; F & R CLUB, INC. doing business as Silk Bar & Grill Cabaret; ATCOMM SERVICES, INC., doing business as Broadsteets; HOUMAN SHAGHAGI, doing business as Foxxy's Cabaret; SOUTHEAST TEXAS VENTURES, A TEXAS JOINT VENTURE, doing business as The Trophy Club; KMRC, INC., doing business as LaChatte; ARIS MYLONAS, doing business as Baby Dolls Saloon; MK CLUB & RESTAURANTS, INC., doing business as Moulin Rouge; 10128 TDC 1, INC., doing business as Texas Dolls Cabaret; SOUTHWEST CLUBCO, INC., doing business as Playmates; DUNCAN BURCH, INC., doing business as Michael's International; OBSESSION CABARET, INC., doing business as Obession Cabaret; NORMAN R. GLENN, doing business as West Mt. Houston Newsstand, doing businessas Far West News, doing business as Highway 6 Newsstand; JAMES DREW, doing business as Gold Touch Stress Clinic and Velvet Touch Stress Clinic; PETE CASERLY, doing business as Northwest News; A TO X VIDEO, doing business as Pacific Management Enterprises; HUGHES & ST. CLAIR, INC., doing business as Pacific Management Enterprises; QUASAR INTERNATIONAL, INC., doing business as Pacific Management Enterprises; VIDEO NEWS, INC., doing business as Pacific Management Enterprises; CHUCK WESLEY, doing business as Pacific Management Enterprises; CHUCK WESLEY, INC., doing business as Northwest News; JACOB BORENSTEIN, doing business as Northwest News; 12851-59 WESTHEIMER, INC.; 608 WEST MT. HOUSTON, INC.; GINO A. BARONE, doing business as Ban Management Co., also known as Consolidated Video, doing business as Hillcroft News & Video, doing business as Telephone Road News & Video; HEAVEN VIDEO & NEWS; AIRLINE VIDEO AND THAI COMPANY; CITY WIDE GROUP, INC., doing business as Studz News; ANS, INC. DBA LONE STAR NEWS, doing business as Lone Star News, NORTHSTAR, INC. DBA NORTH FREEWAY NEWS; NORTHEAST, INC. DBA GULF FREEWAY NEWS, doing business as Gulf Freeway News; EASTEX 24-HOUR NEWSSTAND; G. W. ROGERS; R. GLASS; G. HUMPHREY; D. L. STONEHAM; L. J. PUTTERMAN; M. ROBERTS; V. L. AUZSTON; J. J. LANGEN; H. PEREZ; A. LUCKE; Y. HINOJOSA; A. N. MCMILLEN; B. WEBB; R. STERNES; S. MONGONIA; K. MARTIN; N. ROBERTS; V. GOBEA; D. QUICK; K. WARREN; R. SANCHEZ; S. JUREK; N. ESPINOZA; C. EMERY; K. MARTIN; C. COMBS; J. DAMPIER; W. KALINOWSKI; J. CRENSHAW; L. M. BATES; H. MACTAVISH; T. DOVE; E. CASTILLO; K. K. HANNAN; C. J. SHARPE; A. A. COOK; N. BAILEY; T. R. KING; L. B. MEAGHER; N. HENRY; A. BAILEY; D. DODSON; J. SUAREZ; A. N. MCMILLAN; K. ROSENBERRY; C. GARCIA; M. FISHER; D. M. MUENZLER; T. J. OAKLEY; D. CARSWELL; A. KELLY;

T. WESTERN; K. A. RADAR; L. PHILLIPS; T. JONES;
A. GIBSON; G. PIERCE; N. NEUENFELDT; T. ALLEN;
S. L. WHITTNEBURG; P. A. BUFFIN; C. VAUGHN; T. L. ALDAPE;
S. Y. NORENO; L. TAUAREZ; T. DARDAS; N. BARRY; T. STANDRIDE;
J. D. BURDEN; S. S. SALAZAR; H. L. LOCOCO; S. BRADY; S. NNOLI;
E. I. STREET; D. JORGENSON; D. G. LEWIS; P. Z. GERMAN;
J. M. ROGERS, J.R.; B. TEMPLEMIRE; R. DUNCAN; J. EASTERWOOD;
J. C. ACRES; W. TEMPLEMIRE, JR.; TRUMPS, INC.,
doing business as Rick's Cabaret, A Texas Corporation;
ANDREW SEFIA, doing business as Rumors, and others similarly
situated; D. HOUSTON, INC., doing business as Treasures,
a Texas Corporation S.E. MANAGEMENT, INC., doing business as
Northshore Video and News, JEANA WILEY, Operator of Southeastern
Management; NORMAN S. HARRISION,

Intervenor Plaintiffs - Appellees-Cross-Appellants,

ELGIN INVESTMENT COMPANY, LTD, doing business as French Quarter
Theater; KQ INVESTMENTS, doing business as Amenity Caberet;
MARK THAI DO; doing business as Dong Kyong Modeling Studio;
DSSS ARIA MERICA, INC., doing business as Solid Platinum,
a Texas Corporation; MARKETING ORGANIZATION OF AMERICA, INC.,
doing business as Exclusive Tanning, a Texas Corporation;
BUDGET DISTRIBUTORS, INC., doing business as Franc's of Beverly
Hills, a Texas Corporation; MICHAEL D'S RESTAURANT, INC.,
doing business as Houston Salon & Fitness Center,
doing business as Texas Health Salon, a Texas Corporation;
LE CRAZYHORSE CABARET ASTRODOME, INC., doing business as
Malibu Resorts, doing business as Sensational Impressions,
a Texas Corporation; EPZ TRADING COMPANY,
doing business as Texas Health Salon, a Texas Corporation;
DEUX SOEUR ENTERPRISES, INC., doing business as Native Tan,
a Texas Corporation; LIMERICK, INC., doing business as Video
Specials, a Texas Corporation; YOU'RE A TO X VIDEO OUTLET,
INC., a Texas Corporation,

Intervenor Plaintiffs - Appellees,

v.

CITY OF HOUSTON,

Defendant - Appellant-Cross-Appellee.

_____

3

_____


N. W. ENTERPRISES INCORPORATED; AMETHYST ENTERPRISES, INC.;
CAMPUS INVESTMENTS INCORPORATED; 1431 WEST 18TH, INC.;

Plaintiffs - Appellees-Cross-Appellants,

FTU INC.; DAJO, INC.; ICE EMBASSY, INC.; TEXAS RICHMOND
CORPORATION;  ANDREA STAFFORD; FRANK I KENT; AHD HOUSTON, INC.,
a Texas  Corporation d/b/a Centerfolds; DNW HOUSTON, INC.;
PARABAR CO, doing business as Paradise Club; JANE DOE ONE,
Applicants; JANE DOE TWO, Applicants; DEE & DEE ENTERPRISES,
INC.; 9924 I-45 NORTH, INC.; HI-HOUSTON, INC.; CHARLES WESLEY,
INC.; D HOUSTON, INC., doing business as Treasures, a Texas
Corporation; HFR ENTERPRISES, INC.; ANDREA ALLBRIGHT MARCO;
NAOMI L. PARRISH; ANN MARIE HASSELBACH; JEANNE L. GRIGSBY;
SUSAN BOYLE; DANA LYNN THOMAS; KIMBERLY ANN DUSHMAN;
MICHELLE HADLEY; COLLEEN CLOER; LEAH MARIE WILSON;
CARLA K. EATON; ANDREA HILL; GINA OLIVER; HEATHER WELDIN;
CHARISMA BARRY; DONNA SOTO; CHERYL THOMPSON; ROBERT FUREY,

Intervenor Plaintiffs - Appellees-Cross-Appellants,

and

CHIL SOUNG, INC., doing business as BJ's 24 Hour Newsstand;
ET AL (referred to as Chil Soung Appellants),

Intervenor Plaintiffs - Appellees-Cross-Appellants,

KQ INVESTMENTS, doing business as Amenity Cabaret;
MARK THAI DO, doing business as Dong Kyong Modeling Studio;
NORMAN S. HARRISON; DSSS ARIA MERICA, INC., doing business as
Solid Platinum, a Texas Corporation;
MARKETING ORGANIZATION OF AMERICA, INC., doing business as
Exclusive Tanning, a Texas Corporation;
BUDGET DISTRIBUTORS, INC., doing business as Franc's of Beverly
Hills, a Texas Corporation; MICHAEL D'S RESTAURANT, INC.,
doing business as Houston Salon & Fitness Center,
doing business as Texas Health Salon, a Texas Corporation;
LE CRAZYHORSE CABARET ASTRODOME, INC., doing business as
Malibu Resorts, doing business as Sensational Impressions,
a Texas Corporation; EPZ TRADING COMPANY, doing business as
Texas Health Salon, a Texas Corporation;
DEUX SOEUR ENTERPRISES, INC., doing business as Native Tan,

a Texas Corporation;
LIMERICK, INC., doing  business as Video Specials, a Texas
Corporation; YOUR A TO X VIDEO OUTLET, INC., a Texas Corporation;
ELGIN INVESTMENT COMPANY, LTD,
doing business as French Quarter Theater,

Intervenor Plaintiffs - Appellees,

v.

CITY OF HOUSTON,

Defendant - Appellant-Cross-Appellee.

---

**Appeals from the United States District Court
for the Southern District of Texas**

---

Before GARWOOD, JONES, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

These appeals and cross-appeals by the City of Houston and regulated entities arise out of an action brought by 105 individuals and 88 adult entertainment establishments challenging the City of Houston's 1997 amendments to its ordinances governing sexually oriented businesses (SOBs).  We overrule the district court's determination that certain provisions of the amendments should be treated as content-based and thus subject to strict scrutiny. Instead, all of the provisions of City Ordinance 97-75 challenged on First Amendment grounds should be subjected to intermediate scrutiny.  We reverse and remand the court's holding that invalidated the provisions of the amendments that extended the distance regulations for SOBs.  We dismiss for lack of appellate

jurisdiction the court's partial rulings on the provisions that included public parks and redefined multi-family dwellings for purposes of establishing buffer zones between SOBs and protected land uses. We affirm the district court's judgment in nearly all other respects.

BACKGROUND

City Ordinance 97-75 is the most recent in a long line of ordinances enacted by the City of Houston to regulate SOBs.[1] In 1977, the City enacted Ordinances 77-1259 and 77-1260, which prohibited the operation of adult commercial establishments within 2,000 feet of any church, school, or other educational or charitable institution. N.W. Enters., Inc., 27 F. Supp. 2d at 770. This ordinance was struck down by a federal district court on First and Fourteenth Amendment grounds; on appeal this court did not reach the constitutional issues. Id.

The City of Houston enacted new ordinances in 1983, 1985, 1986, 1991, and 1997. Under the 1985 version of the ordinance (as amended in 1986), SOBs were prohibited from operating within 750 feet of a school, church or place of worship, or daycare center; or within 1,000 feet of any other SOB, or on any other tract of land for which seventy-five percent or more of the tracts within a 1,000-foot radius were residential. Id. The 1985/1986 ordinance also

---

[1] For a more detailed recounting of the history of the City of Houston's regulation of SOBs, see N.W. Enters., Inc. v. City of Houston, 27 F. Supp. 2d 754, 770-72 (S.D. Tex. 1998).

regulated the exterior decor and signage of SOBs.  Id.  These regulations were upheld against various constitutional challenges in SDJ, Inc. v. City of Houston, 837 F.2d 1268 (5th Cir. 1988), cert. denied sub nom., M.E.F. Enters., Inc. v. City of Houston, 489 U.S. 1052 (1989).

Ordinance 97-75 was enacted on January 15, 1997.  It significantly amended Houston's ordinances governing SOBs.  Several aspects of 97-75 are challenged in this case:  (1) the increase in the minimum distance from 750 feet to 1,500 feet between an SOB and protected land uses; (2) the addition of public parks to the list of protected land uses; (3) the increased importance of multi-family dwellings in determining whether an area is at least seventy-five percent residential; (4) regulations of "adult mini-theatres"; (5) delayed implementation and amortization provisions; (6) added restrictions on exterior signs; (7) added requirements regarding interior lighting, design and layout; and (8) licensing of managers and entertainers.

The appellees filed suit a week after the ordinance was enacted.  In 1998, the district court granted summary judgment on most of the issues in the case.[2]  The district court held that the portion of the ordinance increasing the distance requirements was

---

[2]  The district court issued three separate opinions: (1) Amended Memorandum Opinion and Order of June 9, 1998, N.W. Enters., Inc., 27 F. Supp. 2d at 754; (2) Supplemental Memorandum Opinion and Order of June 11, 1998, N.W. Enters., Inc., 27 F. Supp. 2d at 860; and (3) Amended Memorandum Opinion and Order Regarding Conspicuous Display Requirement of August 10, 1998, N.W. Enters., Inc., 27 F. Supp. 2d at 913.

an unconstitutional content-based regulation that must be reviewed with strict scrutiny under the First Amendment. The court denied summary judgment on whether it was constitutional to add public parks to the list of protected uses and on the modification of the treatment of multi-family dwellings, finding genuine issues of material fact as to whether there would be sufficient alternative avenues of communication for the SOBs if these modifications were upheld. The court upheld nearly all of the provisions of the ordinance related to exterior and interior appearance, implementation and amortization, finding that they were content-neutral regulations that survive intermediate scrutiny. The court subjected the signage provision's application to § 216 of the Texas Local Government Code. The court upheld the regulations pertaining to adult mini-theatres. The court upheld the permit requirements for entertainers and managers under intermediate scrutiny but enjoined the City of Houston from requiring on individuals' applications the disclosure of personal phone numbers, home addresses, and criminal record information beyond what the Ordinance uses in granting or denying a permit. The court also enjoined the City from requiring managers to conspicuously display personal identification cards while working in SOBs, as it found this requirement a content-based regulation that does not withstand strict scrutiny.

## STANDARD OF REVIEW

8

We review a district court's grant of summary judgment <u>de</u> <u>novo</u>. <u>Hodges v. Delta Airlines, Inc.</u>, 44 F.3d 334, 335 (5th Cir. 1995) (en banc). Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999); <u>see</u> <u>also</u> FED. R. CIV. P. 56(c). If the moving party meets its burden, the non-movant must designate specific facts showing there is a genuine issue for trial. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). We review questions of statutory interpretation <u>de</u> <u>novo</u>. <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999).

**DISCUSSION**

Several dozen issues are raised on appeal by the parties. Overarching the discussion are the questions whether strict or intermediate scrutiny governs the constitutional analysis of the Ordinance and whether the Ordinance generally violates state constitutional or statutory provisions. We will discuss these issues first. Next we will address 97-75's provisions that limit the location of SOBs. The interpretation and constitutionality of amended regulations for the physical structure and exterior signage of SOBs comprise the third section of the opinion. Finally, we consider issues surrounding the licensing of SOB employees.

**I. General Issues**

## A. Strict or Intermediate Scrutiny

While no sea change occurred in the constitutional status of SOBs during the pendency of this case on appeal, the Supreme Court refined the <u>Renton</u> test[3] in the interim, <u>see</u> <u>City of Los Angeles v. Alameda Books, Inc.</u>, 535 U.S. 425, 122 S.Ct. 1728 (2002), and partially superseded the district court's analysis. In <u>Alameda Books</u>, the Court majority (including Justice Kennedy in a separate concurrence) reaffirmed the three-part <u>Renton</u> test, which considers (a) whether a sexually oriented business zoning ordinance is a time, place and manner regulation; (b) whether the ordinance is aimed at the content of sexually-oriented speech (content-based) or the "speech's" secondary effects on the community (content-neutral); and after passing those tests, (c) whether the ordinance is designed to serve a substantial governmental interest and leaves open reasonable alternative avenues of communication. <u>See</u> <u>Alameda Books</u>, 535 U.S. at 433-34, 122 S.Ct. at 1733-34, citing <u>City of Renton</u>, 475 U.S. at 47, 106 S.Ct. at 930.

In that opinion, the Court expressly distinguished between the second and third parts of the <u>Renton</u> test, explaining that:

> The former requires courts to verify that the "predominate concerns" motivating the ordinance "were with the secondary effects of adult [speech], and not with the content of adult [speech]." The latter inquiry goes one step further and asks whether the municipality can demonstrate a connection between the speech regulated by the Ordinance and the secondary effects that motivated

---

[3]      <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 50, 106 S.Ct. 925, 930 (1986).

> the adoption of the Ordinance. Only at this stage did
> <u>Renton</u> contemplate that courts would examine evidence
> concerning regulated speech and secondary effects.

<u>Id</u>. at 440-41, 122 S.Ct. 1728 (quoting <u>Renton</u>, 475 U.S. at 47, 106 S.Ct. 925) (alterations in original). According to the majority, intermediate scrutiny applies to SOB regulations whenever the governmental entity was predominantly concerned with regulating secondary effects of adult speech. Justice Kennedy agreed that "the central holding of <u>Renton</u> is sound: a zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." <u>Alameda Books</u>, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring). Consequently, while Justice Kennedy takes issue with the plurality's use of the content-based/content-neutral dichotomy in these cases, he, too, would apply the intermediate scrutiny standard to regulate secondary effects of adult speech so long as a municipal regulation does not ban the protected speech.

The district court intermingled the second and third prongs of the <u>Renton</u> test in a way rejected by the <u>Alameda Books</u> majority. To determine the City's "predominant concern," the district court felt it should ascertain "whether the City Council relied on evidence in the legislative record from which it could have determined that negative secondary effects associated with adult businesses actually exist <u>and</u> that the proposed regulations would in some way address these effects." <u>N.W. Enters., Inc.</u>, 27 F. Supp. 2d at 776 (emphasis added). The district court required

11

this double proof before assessing the standard of review (strict or intermediate scrutiny) applicable to each provision of 97-75. For example, in discussing whether the provision that increased from 750 to 1,500 feet the distance an SOB must be located from certain land uses was content-neutral or content-based, the court repeatedly stated that there was no evidence in the record before the City Council that SOBs caused secondary effects more than 750 feet but less than 1,500 feet away. N.W. Enters., Inc., 27 F. Supp. 2d at 805, 870, 875. Alameda Books forecloses this approach.

The standard of constitutional scrutiny, after Alameda Books, and taking into account Justice Kennedy's concurrence, is simply whether Ordinance 97-75 addressed secondary effects of adult speech, as demonstrated by the legislative record submitted by the City. Even before Alameda Books, however, neither the Supreme Court nor this court required proof of the efficacy of an ordinance in order to determine the constitutional review standard. This court has invariably analyzed ordinances regulating SOBs as content-neutral time, place, and manner restrictions where the legislative record demonstrated that the municipality's predominant concern was to regulate secondary effects of SOBs and not to censor the expression itself.[4] Thus, in SDJ, Inc., as in other cases, this

---

[4] See, e.g., Encore Videos, Inc. v. City of San Antonio, 330 F.3d 288, 291 (5th Cir. 2003)(treating ordinance as content-neutral where this court had previously found that the city had specific evidence of secondary effects); LLEH, Inc. v. Wichita County, Tex., 289 F.3d 358, 368 (5th Cir. 2002) (finding adequate evidence that county's predominant concern was reducing secondary effects where legislature gathered evidence of secondary effects related to SOBs and the measures taken by other legislatures); Lakeland Lounge of Jackson, Inc. v. City

court treated the ordinance at issue as a content-neutral regulation where "the <u>findings of the Houston council as to the secondary effects</u> of sexually oriented businesses satisfy [the court] . . . that the city's predominant concern was with secondary effects and not the content of expression itself." 837 F.2d at 1273 (emphasis added).[5] This line of case fulfills <u>Renton</u>, which, while reiterating that legislators' subjective motivations alone cannot condemn an otherwise constitutional statute, cited as sufficient the purpose of the city's ordinance. <u>Renton</u>, 475 U.S. at 48, 106 S.Ct. at 929, quoting <u>United States v. O'Brien</u>, 391 U.S. 367, 383-84, 88 S.Ct. 1673, 1683 (1968). Because that ordinance's expressed purpose was to "'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views," <u>id</u>., the Court deemed it content-neutral.

Further, the City need not demonstrate that the City Council actually relied upon evidence of negative secondary effects when it enacted 97-75. A local government can justify a challenged ordinance based both on evidence developed prior to the ordinance's

<u>of Jackson</u>, 973 F.2d 1255, 1258-59 (5th Cir. 1992) (analyzing SOB ordinance as content-neutral where the city council made findings supported by evidence that SOBs have harmful effects on the community).

[5] The district court appears to have misread <u>SDJ</u>, as it cited two paragraphs of that opinion dealing with the third <u>Renton</u> inquiry, transposing an inapposite discussion to <u>Renton</u>'s content-based/content-neutral second inquiry. <u>See</u> <u>N.W. Enters., Inc.</u>, 27 F. Supp.2d at 777 (citing <u>SDJ</u>, 837 F.2d at 1274). <u>SDJ</u> applied across-the-board intermediate scrutiny to Houston's ordinance without proof of efficacy under <u>Renton</u>'s second prong. <u>See</u> 837 F.2d at 1273.

13

enactment and that adduced at trial.  J & B Entm't, Inc. v. City of Jackson, Miss., 152 F.3d 362, 371-72 (5th Cir. 1998) (citing Barnes v. Glen Theatre, Inc., 501 U.S. 560, 582, 111 S.Ct. 2456, 2469 (1991) (Souter, J., concurring)).  This is because the "appropriate focus is not an empirical inquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional."[6]  Barnes, 501 U.S. at 582, 111 S.Ct. 2469 (Souter, J., concurring).

To require the legislature to show evidence of negative secondary effects and of the new regulations' efficacy requires too much of the City at this stage in the inquiry.  Disputes over the effectiveness of the proposed regulations are properly reserved for the final prong of the Renton analysis.  See, Alameda Books, supra.

The Houston City Council made express findings of adverse secondary effects related to SOBs and the City's interest in ameliorating those effects.  The preamble to 97-75 states:

> WHEREAS, the City Council finds that sexually oriented businesses can exert dehumanizing influences on churches, schools, and day care centers, can have negative effects on property values, [and] can contribute to increased criminal activities in the surrounding areas . . . and . . .

---

[6]     As Justice Souter further noted: "At least as to the regulation of expressive conduct, 'we decline to void [a statute] essentially on the ground that it is unwise legislation which [the legislator] had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator had made a 'wiser' speech about it.'"  Barnes, 501 U.S. at 582, 111 S.Ct. 2469 (Souter, J., concurring) (quoting United States v. O'Brien, 391 U.S. 367, 384 (1968)).

14

WHEREAS, the City Council finds that comprehensive new land use studies by the Department of Planning and Development demonstrate that increasing such distances to 1,500 feet would not unduly impact the availability of conforming sites for sexually oriented businesses; and

WHEREAS, the City Council finds that increasing such distances to 1,500 feet would provide additional and needed protection to the community from the adverse effects of sexually oriented businesses without depriving such businesses of adequate opportunities to locate within the City; and

WHEREAS, the City Council finds that Article III of Chapter 28 of the Code of Ordinances should be amended to enhance provisions regarding signage, configuration, conduct of entertainment, age of admission and related matters to reduce the secondary effects of sexually oriented businesses upon the community and further protect the health, safety and welfare of the public; and

WHEREAS, the City Council finds that sexually oriented businesses provide enhanced opportunities for employee participation in various forms of criminal activities, including prostitution, lewd conduct, indecent exposure, obscenity law violations and related crimes that are associated with sexual conduct or sexually-oriented materials; and

WHEREAS, the City has a substantial public concern that its residents be protected from criminal activity and be protected from casual sexual activity that facilitates the spread of sexually transmitted diseases . . . .

Preamble to Ordinance 97-75, at 2, 4.[7] Further, as part of its summary judgment materials, the City introduced sections of the legislative record supporting its current and former SOB ordinances.

---

[7] An eight-member committee of the Houston City Council that proposed 97-75 specifically described its increased distance regulations as a means "to protect such land uses from the adverse secondary effects of SOBs," "without unduly restricting availability of conforming locations for sexually oriented businesses to operate." The Committee report systematically explains the need for the regulations effected by 97-75 in terms of the adverse secondary effects of SOBs, including increased crime, illicit sexual conduct, and narcotics violations.

See N.W. Enters., Inc., 27 F. Supp. 2d at 803 n.103. That legislative record was held sufficient by this court to justify characterizing Houston's prior SOB ordinance as content-neutral. See SDJ, Inc., 837 F.2d at 1273.

Together, these materials justify the conclusion that the City's predominate concern was to regulate the secondary effects of SOBs. Under either the plurality opinion or Justice Kennedy's concurrence in Alameda Books, intermediate scrutiny applies. The City need not relitigate this issue every time its SOB ordinances are challenged. As Justice Souter observed: "Given our recognition that 'society's interest in protecting this type of expression is wholly different, and of lesser, magnitude, than the interest in untrammeled political debate,' I do not believe that a State is required affirmatively to undertake to litigate this issue in every case." Barnes, 501 U.S. at 584-85, 111 S.Ct. 2470 (Souter, J., concurring); see also City of Erie v. Pap's A.M., 529 U.S. 277, 296-98 (2000) (O'Connor, J., opinion joined by Rehnquist, C.J., Kennedy and Breyer, JJ.) (city can rely on the evidentiary foundation found in other Supreme Court cases regarding secondary effects); Encore Videos, Inc., 330 F.3d 288, at 291 (5th Cir. 2003) (opinion on reh.) (where a predecessor ordinance was sufficiently supported to apply content-neutral review, same findings were sufficient to consider a subsequent ordinance content-neutral); BGHA LLC v. City of Universal City, Texas, 340 F.3d 295 (5th Cir. 2003).

16

Because the constitutional standard of review depends only upon the City's predominate legislative concern, not its pre-enactment proof that the ordinance would work, there is no reason to parse each provision of the ordinance separately to determine the standard of review. The district court's conscientious methodology, bred by its misapplication of the second prong of <u>Renton</u>, was flawed in this respect. In fact, all parties seem to recognize the court's error; although differing in which level of scrutiny they advocate, they urge us to apply one level consistently to the Ordinance. The purpose and scope of the entire Ordinance are reflected in the above-quoted preamble, which summarizes City Council's concern about multiple effects of SOBs. That all of such effects are targeted by the Ordinance's various provisions is clear, as it is also clear that none of the provisions directly censors adult speech. Thus, the Preamble, together with the legislative record, provides sufficient evidence to justify an intermediate scrutiny standard of review to the entirety of 97-75, as a content-neutral enactment.

**B.    The "Shell Game" Argument**

Appellees argue that it is unconstitutional for a city to change the rules repeatedly, with retroactive impact, and to affect drastically the overwhelming majority of existing adult businesses each time. The district court rejected what the SOBs describe as a "shell game" argument, observing that the City "has the prerogative of experimenting with different possible solutions to municipal

17

problems even when dealing with First Amendment interests."[8]  N.W. Enters., Inc., 27 F. Supp. 2d at 882 (citing City of Renton, 475 U.S. at 52).  The district court further noted that the plaintiffs "cited no authority for the proposition that enacting a significant change of rules for adult businesses, even for a second time, in and of itself violates the First Amendment."  Id.

On appeal, no relevant legal authority has been cited in support of the "shell game" argument.[9]  Moreover, the SOBs have not attempted factually to support their contention that the City's course of amendments has successively put SOBs out of business. Their argument also fails, because, as stated by the district court, it conflicts with the authority expressly reserved to cities in City of Renton, and reaffirmed in Alameda Books, to experiment with different possible solutions to municipal problems.  Renton, 475 U.S. at 52, 106 S.Ct. at 931; see also Alameda Books, 535 U.S. at 434, 122 S.Ct. at 1736-37.  Appellees' broad argument, if accepted, would hobble municipalities.

## C.   Article I, Section 8 of the Texas Constitution

---

[8]   The district court explained however, that each change to the ordinance must satisfy "the requisite constitutional test."  Id.

[9]   FTU does cite some cases only for the purpose of declaring them inapplicable.  Moreover, in its opening brief, FTU cites Gammon v. City of Anaheim, 73 Cal. App. 4th 186, 86 Cal. Rptr. 2d 194 (Cal. Ct. App. 1999) in support of its shell game argument.   In Gammon, the court held that the City of Anaheim could not deny a permit to a sexually-oriented business that met all the requirements to obtain a permit on the basis that the City may plan to "redevelop" the area in the future. Id. at 199.  FTU makes no effort to explain why this analysis should apply in the instant case.

18

AHD contends that Article I, Section 8 of the Texas Constitution affords broader free speech rights to those involved in sexually oriented businesses than does the federal Constitution. This argument is foreclosed by Fifth Circuit precedent. Woodall v. City of El Paso, 49 F.3d 1120, 1127-28 (5th Cir. 1995). Since Woodall was written, neither the Texas Supreme Court nor lower state courts have issued any rulings undermining its conclusion.

**D.    97-75's Status as a Texas "Zoning Regulation"**

AHD argues that Ordinance 97-75 is a "zoning regulation" that was not validly enacted. In Texas, the passage of zoning regulations requires compliance with special procedural rules. But AHD's premise is invalid. This ordinance is no zoning regulation. The district court thoroughly and completely rejected this argument. N.W. Enters., Inc., 27 F. Supp. 2d at 795-98.

First, while the Texas Supreme Court characterized certain ordinances, which restricted the permissible locations of mobile homes, as "hav[ing] the effect of a zoning regulation," the court also held that the regulations were not "zoning regulations." City of Brookside Village v. Comeau, 633 S.W.2d 790, 793 n.4 (Tex. 1982). Second, AHD cites no authority to support its argument that prohibiting adult businesses from locating within 1,500 feet of churches, schools, day care centers, parks, and residential areas would produce hundreds of 162-acre regulated areas and would effectively comprise a comprehensive land use plan tantamount to

19

zoning.

Finally, AHD observes that this and other courts have described regulations similar to those in 97-75 as zoning ordinances. For example, this court described the predecessor to 97-75 as "a detailed ordinance imposing licensing and zoning restrictions upon sexually oriented businesses" and described the ordinance adjudicated in City of Renton as "a city zoning provision similar to the Houston ordinance." SDJ, 837 F.2d at 1271, 1273. The use of generic terminology in federal court opinions is a far cry from a legal holding that the Houston ordinance amounts to zoning under Texas law.

## II. 97-75's Provisions Regarding the Location of SOBs and the Treatment of Multi-family Dwellings and Public Parks as Protected Uses

The district court split the amended locational restrictions on SOBs into three parts: the expansion from 750 to 1,500 feet of the buffer zone between SOBs and protected land uses; the addition of public parks to protected land uses; and the extra weight afforded multi-family residences in the buffer zone calculation.[10] The court then separately determined the constitutional standard of scrutiny for each part of the restrictions

---

[10] Section 28-125(b)(1) of 97-75 states that an SOB cannot receive a permit to operate if the SOB is within 1,500 feet of any school, church, public park, or licensed day-care center. Further, Section 28-125(b)(3) of 97-75 prohibits issuance of an SOB permit if seventy-five percent of the tracts in an area within 1,500 feet of the SOBs location are residential in character. Section 28-125(b)(3) also counts a multi-family tract equivalent to eight residential tracts.

20

according to the methodology we have previously found in error. Additional procedural and substantive complications flow from the court's final complex ruling on locational restrictions. Ultimately, however, the locational restrictions lack only one qualification for being instantly upheld.

First, although the court no doubt acted with the best intentions, it should not have trifurcated the locational restrictions. The court cited no authority to explain why separate constitutional analysis of the components of a buffer zone formula is required, meaningful or practical. That a city may choose to insulate public parks and multi-family residences from SOBs because of the likely presence of children at the protected locations is just as obvious, and done for the same reasons, as the choice of insulating schools, churches, single-family homes and day-care centers.[11] (Houston's ordinance already protected these other land uses.) The material constitutional questions, posed by _Renton_'s third prong, are whether the buffer zone <u>in</u> <u>toto</u> addresses substantial governmental interests and leaves sufficient alternative avenues of communication. Thus, the City was required to justify its buffer zone in light of all the protected uses it might define. The City's burden is substantial even without its having to foresee, and separately map out, the possibilities that would arise from a

---

[11] Even under its flawed methodology, the district court expressly held that the public parks and multi-family residence components serve a substantial governmental interest.

21

court's picking and choosing among each individual protected use. Here, for instance, the court was requiring the City to provide information on the separate impacts of public parks and the recalculated multi-family residence formula on the number of alternative sites available for SOBs. Given such facially legitimate protected land uses, however, the court should have analyzed the locational restrictions adopted by the City rather than hypothetical variations it created by deconstructing the buffer zone rule.

Second, the court's trifurcation creates a question of appellate jurisdiction, which we consider sua sponte. The court certified for review under FED. R. CIV. PROC. 54(b) its decision that the 1,500-foot buffer zone, increased from 750 feet, is "content based" and unconstitutional under a strict scrutiny standard. The court also certified as a "final" judgment under Rule 54(b) its partial approval of the public parks and multi-family residence components of the buffer zone, but, finding fact issues extant, it expressly declined to complete the analysis of those components.[12] The latter certifications are flawed, because Rule 54(b) allows a district court to enter final judgment "as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay . . . ." Eldredge v. Martin

---

[12] The court held that factfinding was required to determine whether the parks and multi-family residence provisions left sufficient alternative avenues of communication to satisfy Renton's third prong. See N.W. Enters., Inc., 27 F. Supp. 2d at 911-12.

22

Marietta Corp., 207 F.3d 737, 740 (5th Cir. 2000) (quoting Rule 54(b)). At best, the court certified only elements of what it viewed as separate claims concerning the public parks and multi-family residence components. The certifications satisfy neither the "final judgment" nor "separate claim" requirements of Rule 54(b). Consequently, we lack Rule 54(b) appellate jurisdiction over the public parks and multi-family residence provisions.

The issue thus correctly before us is the constitutionality of the City's amended 1,500-foot locational restriction without considering the public parks and multi-family residence amendments. See City of Renton, 475 U.S. at 53-54, 106 S.Ct. at 932. The amended restriction is reviewed under intermediate scrutiny, as was previously explained.[13] Under the Renton test, the remaining questions are whether the increased locational restriction addresses substantial governmental interests and allows reasonable alternative avenues of communication.

In Alameda Books, the Court determined to "clarify the standard for determining whether an ordinance serves a substantial governmental interest." 533 U.S. at 430, 122 S.Ct. at 1731. The plurality began with a recapitulation of Renton, noting that the city there had met its burden of proving that an ordinance prohibiting the location of any SOB within 1,000 feet of protected land uses served a substantial governmental interest. The city had

---

[13] Because the district court erroneously applied strict scrutiny review, its invalidation of this part of 97-75 cannot be sustained.

23

relied on other cities' studies of the secondary effects of SOBs. With regard to the different type of SOB dispersal ordinance at issue before it in <u>Alameda Books</u>, the Court rejected the Ninth Circuit's requiring Los Angeles to prove that the amelioration of secondary effects postulated by its ordinance "is a necessary consequence of" Los Angeles's independent study. <u>Id</u>. at 437, 122 S.Ct. at 1735. The Court added that it would not require localities to disprove other possible implications of the legislative materials at their disposal, because <u>Renton</u> "specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech." <u>Id</u>. at 438, 122 S.Ct. at 1736.[14] Nor would municipalities be required to prove, not merely by common sense, but empirically, that SOB ordinances <u>will</u> successfully reduce crime, as this would undermine <u>Renton</u>'s allowance of local experimentation in responding to secondary effects. <u>Id</u>. at 439, 122 S.Ct. at 1736.

The Court explained its deference to the legislative evidentiary judgment as born of competing policies: that of protecting constitutional speech and that of respecting local legislators' superior understanding of local problems. <u>Id</u>. at 440, 122 S.Ct. at 1737. The point of deference is this: legislators cannot act, and cannot be required to act, only on judicial standards of proof. Legislative zoning decisions are generally

---

[14] Justice Kennedy's concurrence approves the Court's treatment of the evidentiary questions. 535 U.S. at 451, 122 S.Ct. at 1742-43.

24

upheld on a rational basis standard.  Imposing a level of inter-mediate scrutiny, in cases like this, requires more conviction of the connection between legislative ends and means than does the rational basis standard, but only in the sense of "evidence . . . [that] is reasonably believed to be relevant" to the secondary effects in question.  Alameda Books, 535 U.S. at 442, quoting Renton, 475 U.S. at 51-52, 106 S.Ct. at 931.

Viewed from the perspective of Alameda Books, the City of Houston has proven that its strengthened distance regulation furthers substantial governmental interests.  The challengers did not demonstrate that the evidence fails to support the City's rationale or that the City's factual findings are wrong.  Alameda, 535 U.S. at 439, 122 S.Ct. at 1736 (municipality "cannot get away with shoddy data or reasoning.")  Hypothesizing, as the City of Houston did here, that the adverse secondary effects of SOBs, such as increased crime, auto theft, opportunities for prostitution and transmission of sexual diseases, neighborhood blight, and reduced property values would be decreased by dispersing SOBs further from protected land uses, is hardly a new concept.  Consequently, after relying on the judgments, both legislative and judicial, that supported its previous SOB distance regulations and after conducting public hearings (with a mailing list of over 1,000 names), receiving

25

hundreds of written submissions,[15] and receiving copious materials from its Planning, Police and Legal Departments, the City concluded that (a) adverse secondary effects of SOBs remain a problem[16] and (b) increasing the distance restriction to as much as 1,500 feet is necessary to restrain those effects.[17]  On similar evidence, this court recently found that a Texas city's SOB zoning ordinance fulfilled the "substantial government interest" prong of Renton. See BGHA, LLC v. City of Universal City, Texas, supra.

The district court alternatively held that the City failed to prove its  amended buffer zone is "narrowly tailored" at 1,500

_____

[15]    It is not unreasonable to expect a local government to be responsive to the concerns of its citizens as expressed through various community institutions.  In this case, the support for substantive regulation of SOBs came from organizations that represent homeowners throughout the City of Houston, from the wealthiest to the poorer neighborhoods.  The democratic legitimacy that such support affords a legislature is an important consideration for courts to keep in mind when according the legislature the appropriate measure of deference it deserves.  See, e.g., R. Doc. 81, Ex. 22B at 16 (Downtown Historic District, Inc.); id. at 32 (Southeast Neighborhood Coalition); id. at 48 (East Montrose Civic Association); id. at 71 (Greater Hobby Area Partnership); id. at 79 (Gulf Freeway Oaks Club); id. at 80 (Boulevard Oaks Civic Association); id. at 114-16 (Houston Heights Association); id. at 193 (Midtown Tax Increment Reinvestment Zone No. 2);  id. at 223 (Upper Kirby District Association); id. at 244 (Southeast Neighborhood Coalition); id. at 250 (South Main Center Association); id. at 261 (Sharpstown Civic Association); id. at 265 (Boulevard Oaks Civic Association and Southampton Civic Club); id. at 266 (Richmond/Westheimer Residents Association, Inc.); id. at 274 (Neartown Association).  The civic associations uniformly supported more rigorous locational restrictions, and several noted that SOBs, by their attraction of crime and undesirable clientele, were hindering efforts to renovate rundown or disadvantaged neighborhoods.

[16]    The number of SOBs in Houston has increased substantially since the City enacted its distance regulations in 1983.

[17]    There is evidence in the legislative record that increasing the distance to 1,500 feet from redefined residential tracts may actually yield more permissible locations for SOBs, or at the very least does not appreciably reduce the permissible locations, as it increases the circle within which residences may be counted.  As a result, the residential component of the larger circle may decrease. Dee & Dee's brief and the district court acknowledge this effect. See N.W. Enters., 27 F. Supp. 2d at 880.  The district court will of course explore this possibility further on remand.

26

feet, but in light of Renton, as explained by Alameda Books, requiring proof to this degree of exactitude set the bar too high. The City is entitled to experiment with distance regulations. See also, SDJ, Inc., supra at 1276 (courts will not challenge city's legislative decision on the most appropriate distance). Courts should not second-guess such restrictions as long as they are not designed as a subterfuge for banning the protected speech. Here, the hearings, Legal Department advice, SOB Ordinance Revision Committee's Legislative Report, and the Preamble to 97-75 all disclaim any such goal.

The district court's concern with the City's doubling of its buffer zone from 750 to 1,500 feet between SOBs and protected land uses is better placed with Renton's last inquiry, which concerns whether the regulation leaves available sufficient alternative sites for the protected speech. Justice Kennedy's concurrence in Alameda Books, a vote necessary to the Court's judgment,[18] emphasizes that the City may not use its regulation to eliminate businesses as a means to reduce their secondary effects. Alameda Books, Id. at 451, 122 S.Ct. 1728. Before enacting 97-75, the City's SOB Ordinance Revision Committee took extensive testimony from Joseph Chow, the Planning Department's executive responsible for determining the practical effect of each of the municipal SOB distance ordinances for the last 20 years. Chow discussed at length

_____

[18]    See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990 (1976) (rationale of deciding vote on Supreme Court is critical).

in a legislative hearing how the Planning Department, aided by new computer techniques, calculated the availability of potential SOB sites under all of 97-75's locational restrictions.[19] Even with the 1,500-foot requirement, strengthened by the addition of public parks and recalculation of multi-family residences, Chow estimated conservatively that the City offers thousands of potential SOB sites. After litigation commenced, the City offered the two-page affidavit of a Police Vice Division Officer, Steven Andrews, who asserted that 97-75 affords at least 1,362 <u>actual</u> conforming SOB sites and 183 sites that can be operated consistently with the minimum distance between adult businesses. Since there were at most 128 SOBs in Houston when 97-75 was enacted, under any of these estimates it would seem that the City could support its contention that sufficient alternative avenues of communication have been provided.[20]

Like many other issues in this case, however, the path to resolving the question of reasonable alternative sites is not straight. To begin with, the City bears the burden of proving the

---

[19]    Chow's estimates in this regard have been accepted by courts that turned down two previous challenges to Houston's SOB ordinances.  <u>SDJ, Inc.</u>, <u>supra</u>; <u>4330 Richmond, Inc. v. City of Houston</u>, C.A. No. 91-0665 (S.D. Tex. 1997), aff'd per curiam, No. 97-20798 (5th Cir. 1998) (unpub'd).

[20]    This court has held that the provision of just one more site than the existing number of SOBs satisfies a city's obligation to provide alternative avenues of communication.  <u>Woodall v. City of El Paso</u>, 49 F.3d 1120, 1127 (5th Cir. 1995); <u>see</u> <u>also</u> <u>Lakeland Lounge v. City of Jackson, Miss.</u>, 973 F.2d 1255, 1259-60 (5th Cir. 1992) (nine sites for six businesses; <u>Renton</u> does not require a specific proportion of a municipality be open to adult businesses or a certain number of sites); <u>Grand Brittain, Inc. v. The City of Amarillo</u>, 27 F.3d 1068, 69 (5th Cir. 1994).

existence of reasonable alternative sites.  See <u>SDJ, Inc.</u>, 837 F.2d at 1273 ("Applying [the <u>Renton</u>] test requires the City to prove that the Ordinance...leaves open alternative channels of communication.").  See <u>also</u> <u>Alameda Books</u>, 535 U.S. at 434 (plurality opinion states that the ordinance in <u>Renton</u> "would be upheld so long as the City of Renton showed . . . that reasonable alternative avenues of communication remained available"); <u>Lim v. City of Long Beach</u>, 217 F.3d 1050, 1054 (9th Cir. 2000); <u>Phillips v. Borough of Keyport</u>, 107 F.3d 164, 177 (3d Cir. 1997) (en banc).  But <u>cf</u>. <u>Woodall v. City of El Paso</u>, 49 F.3d 1120, 1126 (5th Cir. 1995) ("The Adult Businesses had the burden of proving that the ordinances . . . fail[ed] to provide reasonable alternative avenues of communication.")

The City did not meet its burden for two technical reasons.  First, Chow's testimony to the SOB Ordinance Revision Committee was neither offered by the City nor admitted by the district court for the truth of its contents in the summary judgment proceedings.[21]  The district court specifically noted this failing, <u>N.W. Enters., Inc.</u>, 27 F. Supp. 2d at 877.  Second, and somewhat inconsistently, the court also held that the different estimates of reasonable alternative sites made by Chow and Officer Andrews, both

---

[21]    The district court would have been correct to receive Chow's statements in proper evidentiary form, as against some of the SOB's objections on appeal that he was unqualified to give "expert" testimony.  His testimony on Houston's SOB zoning ordinances has been approved twice before in federal courts.  <u>See</u> <u>SDJ, Inc.</u>, <u>supra</u>; <u>4330 Richmond, Inc.</u>, <u>supra</u>.

of which well exceed the total number of SOBs affected by 97-75, created a genuine, material fact issue on which it declined to rule. N.W. Enters., Inc., 27 F. Supp. 2d at 880-81.  We agree with the district court and with the SOBs, however, that Andrews' affidavit is too conclusory to be probative for summary judgment purposes.[22] In its one-and-a-half pages, there is neither any explanation of Andrews' methodology nor is a map or other device incorporated by which his conclusion may be verified.  The City cannot sustain its burden at this point solely based on Officer Andrews' affidavit.

On remand, further proceedings will be necessary to determine whether there exists any basis for the fear, expressed by Justice Kennedy in Alameda Books, supra, that the ordinance seeks to reduce secondary effects by depriving SOBs of reasonable avenues of communication.  If Chow's legislative testimony is properly admitted, and the City supports Andrews' testimony adequately, and if the SOBs decline, as they did before, to offer controverting evidence, the remaining doubts as to the ordinance's constitutionality in its entirety may be easily dispelled on further summary judgment proceedings.[23]

---

[22]    The SOBs objected to the affidavit below on this basis.  See N.W. Enters., Inc., 27 F. Supp 2d at 880-81.

[23]    Chow's legislative testimony and Andrews' affidavit both estimated the number of potential SOB sites considering the entirety of 97-75:  the 1,500-foot distance regulation and defining public parks and redefined multi-family residences as protected land uses.  Since the district court has already upheld parts of the public parks and multi-family residence provisions, the remaining issue concerning alternative avenues of communication should be addressed as to the entirety of the buffer zone regulations on remand.

30

**III. SOB Regulatory Issues**

**A.    Applying 97-75 to Adult Arcades and Mini-Theatres**[24]

  **1.    Applicability of 97-75 Article III to the arcades and mini-theatres regulated by Article II**

In two footnotes, the district court noted that, while 97-75 Article II applies only to "adult arcades and adult mini-theatres," Article III "applies to <u>all</u> sexually oriented business enterprises, including adult arcades and mini-theatres."  <u>N.W. Enters., Inc.</u>, 27 F. Supp. 2d at 772 n.35 (emphasis in original); <u>see</u> <u>also</u> <u>id</u>. at 791 n.81.  N.W. Enterprises argues instead that the ordinance, if properly construed, regulates adult arcades and mini-theatres under Article II alone, while Article III regulates all <u>other</u> SOB's that are not adult arcades or mini-theatres.  We disagree.

Article II of 97-75 governs adult arcades and adult mini-theatres.  For purposes of Article II, "adult arcade" and "adult mini-theatre" are defined as "any premises that are subject to regulation under Chapter 243 of the Texas Local Government Code" and as premises where people are permitted to use "arcade devices" or

---

        [24]    N.W. Enterprises argues perfunctorily that the district court erred in granting summary judgment to the City on whether the definition of "mini-theatre" in 97-75 § 2:28-81 conflicts with the definition of "adult movie theatre" in § 3:28-121.  The district court refused to address this question, holding that it was "not ripe for resolution."  <u>N.W. Enters., Inc.</u>, 27 F. Supp. 2d at 910.  In lieu of reasoned analysis, N.W. Enterprises merely states in a wholly unsupported argument that its claim is ripe.  A litigant's failure to provide legal or factual analysis results in waiver.  <u>United States. v. Green</u>, 964 F.2d 365, 371 (5th Cir. 1992).  Because N.W. Enterprises failed to brief this issue adequately, the point is waived.

"mini-theatre devices," respectively.[25]  See 97-75: § 2:28-81.  N.W. Enterprises acknowledges that, by incorporating Chapter 243's multi-entity definition of "sexually oriented business," Article II explicitly includes "adult video arcades" and "adult movie arcades" in its scope.  It contends, however, that Article III separately regulates "sexually oriented businesses" that fall within the definition of "enterprise" found in § 28-121 of 97-75.  Because the Article III definition of "enterprise" does not specifically list

---

[25]      Chapter 243 of the TEXAS LOCAL GOVERNMENT CODE regulates "sexually oriented business[es]" as defined in § 243.002 of that chapter.  Section 243.002 states "'sexually oriented business' means a sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theatre, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer."  TEX. LOC. GOV'T CODE ANN. § 243.002 (Vernon 1999).

these two businesses,[26] N.W. Enterprises argues the distance regulations do not apply to adult arcades and adult mini-theatres.

This argument is flawed for three reasons. First, the list of "enterprises" in § 28-121 of Article III is on its face nonexclusive. After identifying specific businesses within its definition, the ordinance adds the following catch-all phrase: "or any establishment whose primary business is the offering of a service or the selling, renting or exhibiting of devices or any other items to provide sexual stimulation or sexual gratification to its customers . . . ." 97-75, § 3:28-121. Adult arcades and mini-theatres certainly fall within this catch-all provision. Second, adult arcades and mini-theatres are not among the businesses explicitly excluded from the enterprise definition. Third, § 28-83

---

[26]    The Article III definition of "enterprise" reads as follows:

Enterprise. An adult bookstore, adult cabaret, adult encounter parlor, adult lounge, adult modeling studio, adult movie theatre <u>or any establishment whose primary business is the offering of a service or the selling, renting or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to its customers</u>, and which is distinguished by or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas. The term 'enterprise' shall not be construed to include:

(1) Any business operated by or employing licensed psychologists, licensed physical therapists, licensed athletic trainers, licensed cosmetologists, or licensed barbers performing functions authorized under the licenses held;

(2) Any business operated by or employing licensed physicians or licensed chiropractors engaged in practicing the healing arts; or

(3) Any retail establishment whose major business is the offering of wearing apparel for sale to customers.

97-75 § 3:28-121 (emphasis added).

of Article II states that its provisions "are supplemental and shall be cumulative with all other laws and ordinances applicable in any manner to an adult arcade or adult mini-theatre or to any owner or operator thereof."  97-75 § 2:28-83.  The district court correctly held that adult arcades and adult mini-theatres are subject to the provisions of Article III of 97-75.

**2.    The Extension of 97-75 Article II to Cover Mini-Theatres**

The City previously regulated only adult arcades, placing licensing and architectural requirements upon them to discourage illicit sexual conduct.  Adult arcades are defined as businesses that provide adult entertainment through machine-operated devices intended for viewing by five or fewer people in the same room. Article II of 97-75, however, extends this coverage to adult mini-theatres, businesses that provide adult entertainment through machine-operated devices intended for viewing by more than five, but less than 100, people in the same room.  The district court held that the expansion of Article II to cover adult mini-theatres was content-neutral, and that it was narrowly tailored to achieve a substantial governmental interest and allowed operators of adult mini-theatres sufficient alternative avenues of communication. <u>N.W. Enters., Inc.</u>, 27 F. Supp. 2d at 792; <u>see</u> <u>also</u> 826-27.

N.W. Enterprises appeals this holding on two grounds.  We reject its initial contention that this amendment was content-based rather than content-neutral and as such is subject to strict

34

scrutiny.  As discussed, <u>supra</u>, 97-75 is properly analyzed in its entirety as a content-neutral regulation.

N.W. Enterprises also challenges the district court's holding that the inclusion of adult mini-theatres in Article II allows sufficient alternative avenues of communication.  We find no error.  To the extent that N.W. Enterprises rests upon the locational issues concerning Article III's provisions regarding public parks and multi-family dwellings, it is misguided.  Article II requires permits and controls the structural design of adult arcades and adult mini-theatres but has nothing to do with their geographic location.  Thus, whether 97-75's locational restrictions facilitate sufficient alternative avenues of communication does not affect whether Article II's inclusion of mini-theatres leaves open sufficient communicative outlets.  In any event, Article II affords adult mini-theatres ample alternative means to convey their erotic message.  <u>See</u> <u>J&B Entm't, Inc.</u>, 152 F.3d at 378 (holding that regulations that required dancers to wear at least pasties and a G-string left open sufficient avenues of communication).  The provisions of Article II in no way limit the message mini-theatres convey.

Thus, the inclusion of mini-theatres in Article II is constitutional under intermediate scrutiny.

**B.   Amortization and Delayed Implementation Under the Ordinance**

**1.   180-day amortization period**

Ordinance 97-75 § 8(a) provides an amortization period of 180 days following enactment for businesses affected by the distance regulations found in Article III.   The ordinance was passed on January 15, 1997, but its enforcement was stayed.   At the time of the district court's decision on August 10, 1998, almost a year and a half had elapsed.

Before the district court, the various plaintiffs objected to the brevity of this period, asserting that the City grants lengthier amortization periods to other businesses rendered non-compliant by the City's regulatory actions.   The district court held that the plaintiffs "do not have standing" to make this argument.   Since the time consumed by litigation had already pro-vided an exceedingly lengthy de facto amortization period, the challengers were not injured by the 180-day provision.   N.W. Enters., Inc., 27 F. Supp. 2d at 823, 888.[27]   The FTU appellees do

---

[27]   The district court also held that the FTU appellees failed to meet their evidentiary burden to mount a successful equal protection challenge to the ordinance.   Id.   Additionally, the district court denied the plaintiffs' motion to compel discovery, which was necessary, the plaintiffs argued, to develop this evidence.   N.W. Enters., Inc., 27 F. Supp. 2d at 823, 889 n.1.

The FTU appellees contest this additional holding with two alterna-tive arguments, both of which are predicated upon the assertion that their claim is not merely an Equal Protection argument, as the district court assumed, but also a First Amendment free speech claim.   FTU's assertion is that, in lieu of a comprehensive plan for land-use, the City enacts "locational restrictions" against a small number of businesses, most (if not all) of which peddle sexually oriented entertainment.   Because the affected businesses are engaged in expres-sive conduct, actions singling them out mandate a higher level of judicial scru-tiny.   We reject this argument as wholly incompatible with constitutional law.

not respond to this holding.  Failure to brief the issue constitutes waiver.  See United States v. Thibodeaux, 211 F.3d 910, 912 (5th Cir. 2000).

### 2.  120-day amortization period

Section 7(a) of 97-75 provides a 120-day grace period for arcades and mini-theatres regulated under Article II, with 30-day extensions available upon request.  This provision allows existing adult mini-theatres and adult arcades time to comply with any new design and architectural restrictions.  N.W. Enterprises argues that the 120-day provision inflicts an unconstitutional taking under the Fifth and Fourteenth Amendments.  This court has, however, previously rejected virtually identical arguments because regulations of the structural design of SOB's do not prevent all reasonable uses of the property and thus are not takings.  SDJ, Inc., 837 F.2d at 1278.

### 3.  The Failure of 97-75 to provide deadlines for hearing officials to decide applications for amortization extensions and deadlines for appeals from denial of amortization extensions.

Under § 8(c) of 97-75, businesses may seek extensions of the 180-day amortization period of § 8(a) by filing an application with a city hearing officer.  The SOBs argue that § 8(c) is unconstitutional in light of FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990), because it sets no definite time limit for hearings, decisions or appeals concerning applications for

37

extension.[28]  The district court held these claims moot because many of the requested amortization hearings had already been held and in most of them, rulings had been issued.[29]  N.W. Enters., Inc., 27 F. Supp. 2d at 820.  Alternatively, the court rejected the plaintiffs' challenge to § 8(c) on the merits.  Id.

We agree with the SOBs that their claims are not moot: they remain subject to the provisions of 97-75, and, as the district court stated, some amortization hearings may still be pending.

However, the SOBs' argument that 8(c) is unconstitutional in light of FW/PBS is without merit.  In FW/PBS, the district court overturned, as an unconstitutional prior restraint, a licensing scheme which did not require city officials to decide upon applications for SOB licenses within a definite amount of time. FW/PBS, 493 U.S. at 223.  The provisions of 8(c) are readily distinguishable from those in FW/PBS.  In FW/PBS, a decision based on a hearing was necessary for an SOB to obtain an operating license, and the SOBs in FW/PBS could not operate until a decision was made.  N.W. Enters., Inc., 27 F. Supp. 2d at 820.  The hearings at issue in this case will consider applications for extensions of time to comply with new regulations beyond the period already

---

[28]   N.W. Enterprises also complains that it is unable to take advantage of § 8's amortization provisions because Article III of 97-75 does not apply to arcades and mini-theatres.  The arguments that N.W. Enterprises makes here reiterate the erroneous belief that Article III is inapplicable to adult arcades and mini-theatres, a contention we previously rejected.

[29]   The district court also stated that the plaintiffs lacked standing because the claims were moot.  Id.  For simplicity, we treat this issue as one of mootness, not standing.

afforded by 97-75.  So long as an SOB is not closed for failure to comply with 97-75 while awaiting a decision on its application for extension, there is no unconstitutional prior restraint.

**C.   Signage and Exterior Appearance Regulations**

**1.   97-75 and Municipal Compensation Review Board**

Section 3:28-130(g) of 97-75 imposes a number of signage restrictions upon SOBs located in "commercial multi-unit centers." This provision evolved out of a concern that some SOBs were attempting to avoid the original signage restrictions placed on freestanding SOBs by converting their premises to "multi-unit centers."  By extending the reach of the existing signage restrictions to multi-unit centers, the Houston City Council aimed to bring all SOBs, regardless of the type of premises they occupied, within the scope of these regulations.  The district court granted summary judgment to the FTU and AHD appellees, holding that the City must follow the procedures outlined in § 216 of the TEXAS LOCAL GOVERNMENT CODE before enforcing 97-75 § 3:28-130(g).  See N.W. Enters., Inc., 27 F. Supp. 2d at 896-99.  Section 216 allows municipalities to require the "relocation, reconstruction or removal of a sign," but requires municipalities to establish "a municipal board on sign control."  See TEX. LOC. GOV'T CODE ANN. § 216.004(a) (Vernon 1999). In addition, § 216 provides that "[t]he owner of a sign that is required to be relocated, reconstructed or removed is entitled to

39

be compensated by the municipality for costs associated with the relocation, reconstruction or removal." Id. at § 216.003(b).

The signage restrictions that would apply to SOBs in multi-unit centers provide that "it shall be unlawful for the owner or operator of any [SOB] . . . to erect, construct or maintain any sign . . . other than one primary sign and one secondary sign." See HOUSTON CITY ORDINANCE 97-75 § 3:28-130(a). In addition, the restrictions prescribe the size, content and overall appearance of the two allowable signs. See id. at § 3:28-130(b)-(f). For the purposes of this ordinance, a sign is defined as:

> Any display, design, pictorial or other representation, which shall be so constructed . . . that the same is visible from the outside of an enterprise and that is used to seek the attraction of the public to any goods, services or merchandise available at such enterprises . . . [and] shall also include such representations painted on or otherwise affixed to any exterior portion of an enterprise as well as such representations painted on or otherwise affixed to any part of the tract upon which such enterprise is situated.

Id. at § 3:28-121.

The City argues that § 216 is inapplicable to SOB signs in multi-unit centers because the regulation does not, by its own terms, require the "relocation, reconstruction or removal" of SOB signs. In addition, the City cites two affidavits from Ms. Ollie Schiller, the Deputy Assistant Director in the Sign Administration of the Public Works and Engineering Department and Sign Administrator for the City of Houston, which indicate the signs in question would not require relocation, reconstruction and removal

40

to comply with 97-75 § 3:28-130. The City argues that Ms. Schiller's opinion is entitled to great deference as she is in charge of enforcing signage restrictions in Houston. It is true that courts often afford agencies substantial deference in the interpretation of statutes that they are charged with enforcing. See, e.g., Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). However, the City incorrectly invokes Chevron deference here. While Ms. Schiller's agency enforces Houston's restrictions on signs, it is not charged with the enforcement of the provisions of § 216. Rather, when a municipal board on sign control is established under § 216, it is entitled to "determine the amount of compensation to which an owner of a sign that is required to be relocated, reconstructed or removed." See TEX. LOC. GOV'T CODE ANN. § 216.005. As a result, Ms. Schiller's interpretation of what constitutes "relocation, reconstruction or removal" of a "sign" for the purposes of the provisions of § 216 does not control this court's determination of the matter.

The state statute is, as the district court noted, somewhat vague on the types of signs it covers — e.g., whether principally freestanding billboards or all signs that "advertise" or "inform" the public. Compare § 216.006 (compensation for relocated sign includes "dismantling" and "transporting" it to another site) with § 216.002 (definitions of "sign," "on-premise sign" (defined as "freestanding") and "off-premise sign"). Further, the parties' briefs dispute whether the ordinance's provisions will

41

require the "relocation, reconstruction or removal" of the signs at issue, or will merely demand de minimis alterations. We express no opinion on these or other questions of fact and state law that are best resolved by a sign control board and state courts in the first instance. We essentially agree with the district court's decision and hold that the City may not enforce § 28-130(g), as amended to include multi-unit centers, without first designating a sign board to oversee compliance with TEXAS LOCAL GOVERNMENT CODE § 216.

## 2. Constitutionality of signage and exterior appearance restrictions.

The SOBs challenge the district court's holding that §§ 28-129 and 28-130 of 97-75 are constitutional. Section 28-129 governs the exterior appearance of SOBs. This provision is unchanged from the exterior appearance provision that SOBs unsuccessfully challenged in SDJ, Inc., 837 F.2d 1268. Like the district court, we are bound by prior decisions of this court.

The plaintiffs also challenge the constitutionality of § 28-130's limitations on SOBs' exterior signage. Substantively, the ordinance's restrictions on signage are identical to provisions upheld in SDJ, Inc., but § 28-130(g) extends the signage provisions to SOBs located in commercial multi-unit centers. This extension is irrelevant for constitutional purposes. If the restrictions are constitutional as to SOBs in stand-alone buildings, the fact that an SOB is located in a multi-unit building cannot make the same restrictions unconstitutional.

42

### 3. Regulations forbidding obstruction of entrances within an SOB, e.g. 97-75 § 3:28-136(b)

Provisions of 97-75 including § 3:28-136(b) require entrances to entertainment rooms to be free of obstacles, including doors.[30] The district court held this requirement facially valid under an intermediate scrutiny standard, because the restrictions were narrowly tailored to the governmental purpose. N.W. Enters., Inc., 27 F. Supp. 2d at 824-27; see also 892-95.

One of the appellees, Ice Embassy, Inc., complained that this requirement is nevertheless unconstitutional as applied to its proposed construction of a "VIP room" in its facility. The room, as designed, would be large (4,000 square feet, seating more than 200 patrons), would be surrounded on all four sides by the main room, would be constructed with clear walls, and would be accessible by way of a clear, heavy, non-locking door. The City appears to concede that this proposed room conforms to §§ 3:28-136(b) and 28-258(c) in every respect except in having a door.

The district court agreed with Ice Embassy, holding the prohibition of a door unconstitutional as applied to large "VIP

---

[30] Ordinance 97-75 § 3:28-136(b) ("It shall be unlawful for any owner, operator or manager of any enterprise to permit any employee to provide any entertainment to any customer in any separate area within an enterprise to which entry or access is blocked or obscured by any door, curtain or other barrier, regardless of whether entry to such separate area is by invitation, admission fee, club membership fee or any form of gratuity or consideration."); id. at § 28-258(c) ("It shall be unlawful for any employee to engage in entertainment or to expose any specified anatomical areas or engage in any specified sexual activities in the presence of a customer in any separate area within an enterprise to which entry or access is blocked or obscured by any door, curtain or other barrier separating entry to such area from any other area of the enterprise.").

rooms." The court's conclusion, however, is tainted by its erroneous application of strict scrutiny review.[31]

In defense of the district court's analysis, Ice Embassy emphasizes that "an essential element of the erotic dance expression . . . is the musical accompaniment," and Ice Embassy aims for a different musical ambience in each of the "rooms" created by the plastic wall. The purpose of the door is thus to minimize ambient noise.

The City contests the district court's reading of the record and the court's legal analysis. Testimony before the City Council graphically demonstrated the use of larger "VIP rooms" for prostitution. Moreover, the City asserts it could have imposed greater restrictions on these rooms (including complete prohibition), but it chose to permit them, requiring only easy access through unobstructed entrances. Finally, the First Amendment protects topless dancing from clothing, not musical accompaniment from ambient noise.

The City's arguments are persuasive. As we have previously explained, the district court should have applied intermediate scrutiny to these content-neutral regulations. The court's misapplication of the strict scrutiny standard led it to

---

[31] Absent a legislative finding regarding such "secondary effects" of large VIP rooms, the court concluded, this restriction is "content-based," subject to "strict scrutiny," and unconstitutional. N.W. Enters., Inc., 27 F. Supp. 2d at 892-95.

ignore the evidence that separate rooms, even large ones, can be and have been used for prostitution. Under the test of intermediate scrutiny, there is an appropriate fit between the means (lack of obstacles) and ends (enforcement of prostitution laws) in the City's regulation.

**D.    Preemption of the regulation of businesses housing "adult arcades and adult mini-theatres" imposed by 97-75 Article II**

N.W. Enterprises argues that Article II of 97-75, which regulates adult arcades and adult mini-theatres, is preempted by Texas Local Government Code § 243.005 because the Ordinance discriminates against them "on the basis" of their coin-operated machines. Section 243.005 states, in pertinent part, that a "regulation adopted under this chapter may not discriminate against a business . . . on the basis of whether it contains one or more coin-operated machines." TEX. LOC. GOV'T CODE ANN. § 243.005(b) (Vernon 1999). Further, a "business is not exempt from regulation under this chapter . . . because it contains one or more coin-operated machines." Id. at § 243.005(a).[32]

---

[32]    Business Licensed Under Alcoholic Beverage Code: Business Having Coin-Operated Machines

(a) A business is not exempt from regulation under this chapter because it holds a license or permit under the Alcoholic Beverage Code authorizing the sale or service of alcoholic beverages or because it contains one or more coin-operated machines that are subject to regulation or taxation, or both, under Chapter 8, Title 132, Revised Statutes.

(b) A regulation adopted under this chapter may not discriminate against a business on the basis of whether the business holds a license or permit under the Alcoholic Beverage Code or on the basis of whether it contains one or more coin-operated machines that are subject to regulation or taxation, or both, under

45

The district court granted summary judgment to the City, reasoning that the basis for 97-75 Article II's regulation of "adult arcades and adult mini-theatres" is their provision of adult entertainment, not possession of coin-operated machines. SDJ, Inc. rejected a similar preemption challenge to a zoning ordinance affecting alcohol-serving establishments: "the Ordinance does not regulate the land use of these businesses on the basis of their alcohol use, but regulates them as a result of the secondary affects [sic] they have on surrounding areas." N.W. Enters., Inc., 27 F. Supp. 2d at 790 (quoting SDJ, Inc. v. City of Houston, 636 F. Supp. 1359, 1373-74 (S.D. Tex. 1986)); see also SDJ, Inc., 837 F.2d at 1280.

Additionally, § 243.005(a) of the TEXAS LOCAL GOVERNMENT CODE explicitly forecloses the preemption argument that N.W. Enterprises presents. Section 243.005(a) explicitly states that a business is not exempt from municipal regulations enacted pursuant to chapter 243 of the Local Government Code because it contains coin-operated machines that are subject to regulation under other statutes. Since 97-75 was enacted by the City of Houston under the authority of Chapter 243, adult arcades and adult mini-theatres are not exempt

---

Chapter 8, Title 132, Revised Statutes.

   (c) This chapter does not affect the existing preemption by the state of the regulation of alcoholic beverages and the alcoholic beverage industry as provided by Section 1.06, Alcoholic Beverage Code.

TEX. LOC. GOV'T CODE ANN. § 243.005 (Vernon 1999).

from its provisions based on the fact that they contain coin-operated machines.

N.W. Enterprises also argues that 97-75's location and distance requirements violate another state law. Specifically, they contend, under § 2153.452 of the TEXAS OCCUPATIONS CODE[33] the City may not prohibit the location of coin-operated machines more than 300 feet from churches, schools, or hospitals. See B&B Vending Co. v. City of Garland, 711 S.W.2d 132, 134 (Tex. App. – Tyler 1986, writ ref'd n.r.e.). The statute provides that

    (a) For purposes of zoning, a political subdivision of this state shall treat the exhibition of a music or skill or pleasure coin-operated machine in the same manner as the political subdivision treats the principal use of the property where the machine is exhibited.

    (b) Subsection (a) does not prohibit a municipality from restricting the exhibition of a coin-operated amusement machine within 300 feet of a church, school, or hospital.

TEX. OCC. CODE ANN. §2153.452 (Vernon 2003).

This argument is refuted by the statute itself. As noted earlier, the City enacted 97-75 pursuant to authority granted under Chapter 243 of the LOCAL GOVERNMENT CODE. Section 243.005(a) states that businesses are not exempt from ordinances enacted pursuant to Chapter 243 even though they contain coin-operated machines that are

---

[33] The parties and the district court refer to this statute as TEX. REV. CIV. STAT. ANN. art. 8814. It was repealed and codified as section 2153.452 in 1999. See ACT OF MAY 13, 1999, 76th Leg. R.S., ch. 388, § 6(a), 1999 TEX. GEN. LAWS 2439-40.

also subject to regulation under 2153.452.[34] <u>B&B Vending Company</u> is distinguishable because the ordinance at issue in that case was not a regulation of SOBs. <u>B&B Vending Company</u>, 711 S.W.2d at 133 (coin-operated machine owner sought a permit to put video games in a fast food restaurant). Thus, § 243.005(a)'s exemption was unavailable to the City to defend its regulation in that case. In sum, we affirm the district court's holding that the provisions of 97-75 are not preempted either by TEXAS LOCAL GOVERNMENT CODE § 243.005(b) or TEXAS OCCUPATIONS CODE § 2153.452.

**E.   Stay of enforcement of 97-75 after court rulings**

In <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 110 S.Ct. 596, 107 L. Ed. 2d 603 (1990), the Supreme Court held that any restraint of SOBs prior to judicial review must be limited to a specified brief time period. This court, interpreting this requirement, has held: "Maintaining the status quo means in our view that the County cannot regulate an existing business during the licensing process." <u>TK's Video, Inc. v. Denton County, Tex.</u>, 24 F.3d 705, 708 (5th Cir. 1994). Section 8(a) grants non-complying SOBs a 180-day enforcement moratorium for certain provisions of 97-75. The FTU plaintiffs argue that, while this 180-day moratorium might otherwise be valid, the unusual procedural posture of this

---

[34]     Section 243.005(a) actually refers to coin-operated machines subject to regulation under Chapter 8, Title 132 of the Revised Statutes. Section 2153.452, however, is a codification of article 8814 which was part of Chapter 8, Title 132. Thus, the exemption of § 243.005(a) necessarily extends to businesses regulated under § 2153.452.

48

case condemns it here. The posture and argument is this: The district court invalidated the ordinance's locational restrictions upon enactment. If the ordinance is upheld, the FTU plaintiffs still have the right to a stay-of-enforcement for a certain period of time after this court's ruling. Because the ordinance does not specifically provide for such a contingency, it is constitutionally invalid.

The district court ruled against the FTU plaintiffs, finding that a 180-day delay more than satisfied TK's Video's limited stay-of-enforcement requirement: "Nothing in TK's Video supports Plaintiffs' novel argument that the City was required to build into its Ordinance additional periods of delay contingent on various possible judicial rulings regarding the Ordinance's validity." N.W. Enters., Inc., 27 F. Supp. 2d at 888. We agree. TK's Video merely grants non-complying businesses "a fair opportunity to complete the administrative process and access courts within a brief period." TK's Video, 24 F.3d at 709.

N.W. Enterprises makes a similar argument regarding the grace periods embodied in §§ 7(a) and 9(a) of 97-75. The employee licensing provisions and the structural, visibility, and lighting provisions for adult arcades and adult mini-theatres were originally to become effective on or about May 15, 1997, 120 days after the passage of the ordinance. 97-75: §§ 7(a), 9(a). On account of the pending litigation, the City did not enforce the ordinance until the district court ruled on the City's summary judgment motion and the

49

various cross-motions for summary judgment.  <u>N.W. Enters., Inc.</u>, 27 F. Supp. 2d at 767.  After finding most of the licensing provisions constitutional, the district court allowed the City to begin enforcement of these restrictions on June 5, 1998, over a year after initial enforcement was to begin.  <u>Id</u>. at 900.  Upon finding the entirety of the arcade and adult mini-theatre provisions to be constitutional, the trial court allowed the City to begin overall enforcement against these entities.

Before this court, N.W. Enterprises argues that the district court committed fundamental error and violated due process by allowing one part of the ordinance to be enforced in advance of the others.  In support of this proposition it cites <u>United States v. O'Brien</u>, 391 U.S. 367 (1969).  Because we find no support for this proposition in <u>O'Brien</u> or in the other cases that N.W. Enterprises cites, we find no error in the district court's handling of the enforcement of these regulations.

## IV.  EMPLOYEE LICENSING

The Ordinance requires each manager and entertainer of SOBs to obtain a permit and to display it conspicuously upon himself or herself while working.  The City must issue a permit within 10 days from the date of application unless the applicant has been convicted of or spent time in jail for an enumerated offense within the last five years.  The SOBs and employees challenge various aspects of the permit requirements, and the City contends

that the district court erred in enjoining several aspects of this regulation.

In this section, we affirm the judgment upholding the constitutionality of the Ordinance's permit requirements. We reverse the judgement insofar as it has enjoined the City from (a) requiring permit applicants to disclose their phone numbers and home addresses on permit applications and (b) requiring managers to conspicuously display their identification cards while working in SOBs. We vacate the injunction prohibiting the City from disclosing information on permit applications because the appellees have an adequate legal remedy under state law. We also vacate as moot the injunction prohibiting the City from requiring applicants to disclose information on permit applications beyond that used by the Ordinance to determine permit eligibility, because the City has revised its application forms.

## A. Licensing Procedures

### 1. Ten-day processing period

FTU[35] contends that the district court should have analyzed the validity of the 10-day time period for processing permit applications in § 28-254(c) of the Ordinance under strict scrutiny. The district court, however, correctly classified the permit requirements as content-neutral provisions subject to intermediate scrutiny. Specifically, the legislative record

_____

[35] FTU appellees include individuals who work in SOBs and are subject to the licensing requirements.

51

reflects that entertainers in SOBs may often be more likely to engage in prostitution and illegal lewd behavior, and managers, to some extent, can control entertainers' behavior.

Viewed under a standard of intermediate scrutiny, we disagree with FTU's contention that the 10-day processing period is excessive. The period is well within the 60-day processing period upheld by this court in TK'S Video, Inc. v. Denton County, Tex., 24 F.3d 705 (5th Cir. 1994). FTU concedes that TK's Video is binding precedent on the permissible delay in processing business permits but would distinguish its applicability to individual permits. TK's Video might not strictly control, because processing a business permit application may be more complex and time-consuming than processing the permit of an individual, yet that circumstance supports a shorter time period for processing licenses for individuals. A 10-day processing period for individual permits is reasonable by comparison and does not impose an undue burden. Under intermediate scrutiny, the least restrictive means need not be employed.

FTU relies on Kev, Inc. v. Kitsap County, 793 F.2d 1053 (9th Cir. 1986), to support its argument that the 10-day processing period for entertainer and manager permit applications is excessive and, thus, renders the permit requirements impermissible prior restraints. In Kev, the Ninth Circuit concluded that a five-day delay in issuing dancer permits was unconstitutional because Kitsap County did not demonstrate a need for the delay. Id. at 1060.

52

Contrary to Kev, the record in this case indicates that the time required to do certain background checks justifies the 10-day processing period.

**2. Written requests for temporary permits**

Section 28-254(f) of the Ordinance provides that if the City does not issue or deny a permit within the 10-day processing period, it must immediately issue a temporary permit upon written request by the applicant. FTU argues that the permit requirements are unconstitutional prior restraints on expression because requiring an applicant to submit a written request for a temporary permit is not the least restrictive method for dealing with an untimely response by the City.[36] When analyzing the validity of a content-neutral licensing scheme, however, this circuit does not require that the least restrictive means be implemented. See TK's Video, 24 F.3d at 707-708. Because the ordinance requires the immediate issuance of a temporary license upon written request by an applicant, the Ordinance does not place an undue burden on license applicants.

**3. Days and times for permit application and renewal**

Section 28-254(a) of the Ordinance provides that individuals who want to obtain or renew entertainer or manager permits

---

[36] FTU suggests two less restrictive alternatives. First, the City could allow applicants whose permits have not been issued by the end of the tenth day to immediately begin work on the eleventh day without submitting a request in writing. Alternatively, the City could issue temporary permits when applicants turn in their permit applications so that applicants can work while they wait for their applications to be processed.

can do so between the hours of 8:00 a.m. and 12:00 p.m. on Monday, Wednesday, or Friday. FTU argues that the permit requirements are facially unconstitutional content-based restraints on expression to the extent that the Ordinance discriminates in the days and times during which individuals can apply for permits. We agree with the district court that FTU's complaint does not rise to the magnitude of a constitutional violation.

### 4. Burden of seeking judicial review of a permit denial and burden of proof in court

FTU argues that the Ordinance's dancer and manager permit requirements are unconstitutional because § 28-254(e) places the burden of seeking judicial review of permit denials on permit applicants rather than on the City; FTU also argues that the City should bear the burden of proof in court. In Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L. Ed. 2d 649 (1965), the Supreme Court set forth three procedural safeguards to protect against unlimited suppression of constitutionally protected speech by a motion picture censorship board. First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court. Freedman, 380 U.S. at 58-59, 85 S.Ct. at 739, 13 L.Ed. 2d at 654-55.

In FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed. 2d 603 (1990), Justice O'Connor, joined by two other Justices on the issue, dispensed with the third Freedman requirement when analyzing the validity of an SOB licensing scheme. FW/PBS, 493 U.S. at 229-30, 110 S.Ct. at 607, 107 L.Ed. 2d at 621. This circuit has followed Justice O'Connor in applying only the first two Freedman procedural safeguards when dealing with a licensing scheme that does not present the grave dangers of a censorship system. See, e.g., Encore Videos, Inc. v. City of San Antonio, 310 F.3d 812, 823 (5th Cir. 2002); TK's Video, 24 F.3d at 707-08. Other circuits have also concluded that the third Freedman procedural safeguard does not apply to licensing schemes that do not directly regulate content. See, e.g., MacDonald v. City of Chicago, 243 F.3d 1021, 1035-36 (7th Cir. 2001); Ward v. County of Orange, 217 F.3d 1350, 1355 (11th Cir. 2000); Steakhouse, Inc. v. City of Raleigh, 166 F.3d 634, 640-41 (4th Cir. 1999) (in the context of an administrative process).

FTU urges this court to apply the third Freedman procedural safeguard to the Ordinance's entertainer and manager permit requirements, contending that individual managers and dancers have less motivation and significantly less economic wherewithal than the SOB plaintiffs in FW/PBS to seek judicial review of permit denials. In FW/PBS, Justice O'Connor considers the degree of motivation that an unsuccessful applicant would have to seek judicial review of an adverse administrative decision, but she

55

dispenses with the third <u>Freedman</u> safeguard primarily because "[u]nder the Dallas ordinance, the city does not exercise discretion by passing judgment on the content of any protected speech." <u>FW/PBS</u>, 493 U.S. at 229, 110 S.Ct. at 607, 107 L.Ed. 2d at 621. While the censor in <u>Freedman</u> engaged in presumptively invalid direct censorship of expressive material, the city in <u>FW/PBS</u> simply engaged in the ministerial, nondiscretionary act of reviewing the general qualifications of license applicants. Similarly, the issuance of manager and entertainer permits under Houston's ordinance is a nondiscretionary act that does not require the City to pass judgment on the content of any protected speech.[37] The third <u>Freedman</u> procedural safeguard therefore does not apply; the City need not bear the burden of seeking judicial review of a permit denial nor the burden of proof in court.

## B. Information on permit applications

### 1. Confidentiality

The Texas Public Information Act (TPIA) gives the public the right to obtain information in government records unless the "information [is] considered to be confidential by law, either constitutional, statutory, or by judicial decision." TEX. GOV'T CODE

---

[37] Because the issuance of entertainer and manager permits under the Ordinance is a nondiscretionary act that does not involve passing judgment on the content of protected speech, FTU's reliance on <u>Speiser v. Randall</u>, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed. 2d 1460 (1958) is also misplaced. The Supreme Court placed the burden of proof on the State in <u>Speiser</u> because the State was denying tax exemptions to veterans if they did not sign an oath stating that they did not advocate the overthrow of the government by unlawful means.

56

§ 552.101. The district court declared the information provided by entertainers and managers on their permit applications confidential under the TPIA, and then enjoined the City from disclosing such information. We reverse the injunction because the appellees have an adequate legal remedy under the TPIA. 11A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2942 at 44 (1995) ("[T]he main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no legal remedy."). Because the district court declared the information on entertainer and manager permit applications confidential under the TPIA, the City cannot disclose it to the public. There is no need for the injunction.

## 2. Phone numbers and home address

The district court enjoined the City of Houston from requiring permit applicants to disclose their phone numbers and home addresses on permit applications. We reverse the district court's injunction. The appellees' concern that their phone numbers and home addresses may be disclosed to stalkers, overly-aggressive suitors, or people zealously opposed to SOBs does not justify the injunction because the information on permit applications is confidential under the TPIA. Moreover, the information is substantially related to the law enforcement and administrative needs of the City.

57

AHD, FTU, and Dee & Dee argue that the district court properly enjoined the City from requiring entertainers and managers to disclose their phone numbers and home addresses on permit applications under TK's Video. In TK's Video, this court upheld a licensing scheme that required owners and employees of SOBs to provide information about their age and certain regulatory infractions and sexual offenses because such information "substantially relates to the substantial government interest of curtailing pernicious side effects of adult businesses." TK's Video, 24 F.3d at 710. That the Denton County order at issue in TK's Video did not require license applicants to disclose their phone numbers and home addresses does not mean such information may not be required. While § 8-254(a)(1) requires permit applicants to disclose their home and mailing addresses, the Ordinance does not require permit applicants to disclose their phone numbers, but, under the standard set forth in TK's Video, the City can require the disclosure of such information because there is a "'relevant correlation' or 'substantial relation' between the information required and the government interest." Id. The information may not be necessary to conduct criminal background checks or to ensure that SOBs do not hire underage employees, but it is highly relevant to the ability of law enforcement officers to investigate criminal activity in SOBs.

The information also substantially relates to the City's ability to comply with the notice requirement of the Ordinance. The

58

appellees argue that the City can send the required notice to an address other than an applicant's home address, but the least restrictive means of complying with the notice requirement need not be employed. There is a substantial relation between the information sought and the City's interest; we therefore reverse the district court injunction.

### 3.  Criminal History

Under § 28-254(c) of the Ordinance, the City can deny an applicant a permit based on a conviction for certain criminal acts or jail time served for such acts during the preceding five years. Dee & Dee argues that the district court incorrectly upheld the Ordinance's permit disqualification provision under TK's Video. Dee & Dee reads TK's Video to allow criminal background checks solely to monitor individuals working in SOBs but not to serve as grounds for permit disqualification and argues that the district court decision conflicts with prior Supreme Court and Fifth Circuit precedent. We disagree. The licensing scheme at issue in TK's Video allowed the county director to deny a permit to an applicant if the applicant or the applicant's spouse had been convicted of certain enumerated crimes or had been released from jail for such a conviction within two years for a misdemeanor offense or within five years for a felony offense. This court concluded that histories of misconduct are "plainly correlated with the side effects that can attend [adult] businesses, the regulation of which

was the legislative objective. . . . [E]nds and means are substantially related[,] . . . assur[ing] a level of scrutiny appropriate to the protected character of the activities and sluic[ing] regulation away from content, training it on business offal." TK's Video, 24 F.3d at 710. Under TK's Video, the district court properly upheld the Ordinance's permit disqualification provision.

As explained earlier, the Ordinance allows the City to deny a permit to an applicant who has either been convicted of or spent time in jail for an enumerated crime during the preceding five years. The City's initial permit application, however, required applicants to disclose information beyond that used by the Ordinance to determine permit eligibility. The district court therefore enjoined the City from requiring permit applicants to disclose criminal convictions obtained more than five years before the application, convictions for crimes other than those enumerated in the Ordinance, and time spent in jail for an offense other than one of the enumerated crimes. N.W. Enters., Inc., 27 F. Supp. 2d at 858. Even after the City revised its permit applications to accord with the limitations set by the Ordinance, the district court denied the City's motion to reconsider the injunction. Id. at 901. We vacate the district court injunction as moot because the permit application no longer requires applicants to disclose the information covered by the injunction. See Doe v. Marshall, 622

F.2d 118, 120 (5th Cir. 1980); <u>Sannon v. United States</u>, 631 F.2d 1247, 1249 (5th Cir. 1980).

## C.    Conspicuous Display of Manager Identification Cards

Section 28-256 of the Ordinance requires each manager or entertainer to conspicuously display a personal identification card while working.  The district court upheld the conspicuous display requirement with regard to entertainers as a permissible content-neutral regulation that is narrowly tailored to serve the City's substantial interest in ensuring that only licensed entertainers work in adult businesses.  With regard to managers, however, the district court struck down the requirement under strict scrutiny, concluding that the legislative record contains no justification for the requirement for managers.  After reviewing the record, we disagree with the district court.  Aside from its methodological error in determining what level of scrutiny to apply, the court overlooked evidence in the legislative record that supports the need for the conspicuous display requirement for managers.

Managers monitor entertainers and play an important role in ensuring that they do not engage in illegal activity.  According to the record, though, some managers "look the other way" while entertainers perform lewd dances or illegal sexual acts.[38]  Law

_____

[38]At Houston City Council SOB Committee Meeting on August 26, 1999, a number of vice officers testified to the activities taking place at these clubs. For example, Vice Officer C testified that entertainers often "ask [the patron] to give them some money to tip the manager or the floor person so that they will look the other way while they perform a table dance."  <u>See</u> R. Doc. 81, Ex. 8E at 88.  Vice Officer A testified that the officers had "heard of occasions where the dancers told us that they pay extra to management personnel, floor persons,

enforcement officers must be able to determine from a distance quickly, and without being intrusive, whether both entertainers and managers of clubs are engaging in or permitting illegal activity. The conspicuous display requirement is narrowly tailored to serve this important government interest. Managers need not display their real names but do need to furnish a picture and identification number on their identification cards. We reverse the district court decision on the unconstitutionality of the conspicuous display requirement for managers and hold that the City can require managers to conspicuously display their identification cards while working.[39]

**CONCLUSION**

The district court's rulings in this case are extensive and clearly reflect hard work and thoughtfulness. Upon review of the voluminous briefs and record, we AFFIRM the judgment of the

---

bartenders, waiters to look the other way to make sure that no one know or to warn them that someone is coming up the that they don't know." Id. at 92-93. Indeed, Officer A noted that he had "one experience personally where the two dancers spoke in front of me and asked if they thought the waitress was cool because she wouldn't tell on them or if the manager knew and he said it was cool. In turn, these two persons were willing to perform sex acts on me at the club at the time. They wanted to go through with it. I had to get out of it and did not want to go through with it." Id. at 93. According to Officer A, these entertainers went beyond mere suggestion when he "observed [them] along with another dancer engaged in sex with one another as well as [being] willing to engage in sex with [individuals] who they thought were my business partners, but were other police officers." Id. at 93. In addition, Vice Officer B testified that at one particular club that the Houston Police Department investigated, "the manager also looked the other way as the girls performed table dances for us. So, I'm sure the management did know what was going on." Id. at 92.

[39] AHD argues that the district court erred in upholding the Ordinance's manager and entertainer permit requirements under Article I, Section 8 of the Texas Constitution because they are not the least restrictive means of achieving the City's interests. This argument is without merit. As we noted earlier, the Texas Constitution does not provide broader rights than the First Amendment with regard to SOBs, and there is no plausible reason for construing the state constitution differently with respect to SOB managers and entertainers.

district court in its entirety[40] with the following exceptions. First, we REVERSE the district court's ruling enjoining enforcement of the amended 1,500-foot distance restriction and remand for a determination whether that restriction, in light of the Ordinance as a whole, affords reasonable alternative avenues of communication for SOBs. Second, we DISMISS the cross-appeal of the Court's non-final rulings on the constitutionality of the public parks and multi-family residence provisions. Third, we REVERSE the court's invalidation of 97-75's interior design restrictions related to large VIP rooms. Fourth, we REVERSE the court's invalidation of the requirements that (a) permit applicants disclose phone numbers and home addresses on their applications, and (b) managers conspicuously display their identification cards while at work in SOBs. Finally, we VACATE the court's injunction prohibiting the City from disclosing information on permit applications and requiring applicants to disclose information beyond that required by 97-75.

**AFFIRMED** in Part, **DISMISSED** in Part, **REVERSED** in Part, **VACATED** in Part, and **REMANDED** in Part.

---

[40] We affirm the district court's decision to require the formation of a sign control board pursuant to TEXAS LOCAL GOVERNMENT CODE § 216, but we express no opinion on the scope of the Texas statute or its applicability to signs involved in the amended § 28-130(g).