Opinion issued June 25, 2019



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00237-CV

———————————

**KATHLEEN POWELL AND PAUL LUCCIA, Appellants**

**V.**

**CITY OF HOUSTON, TEXAS, Appellee**

---

**On Appeal from the County Civil Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1043863**

---

## O P I N I O N

The appellants, Kathleen Powell and Paul Luccia (collectively, the Homeowners), own homes in a designated historic district, the Heights East area of the City of Houston (the City). The Homeowners sued the City, asserting that the City's Historic Preservation Ordinance (HPO) violated the Houston City Charter's

prohibition against zoning regulations. Following a bench trial, the trial court rendered a take-nothing judgment in favor of the City on the Homeowners' claims. In three issues on appeal, the Homeowners argue that: (1) the City's HPO and regulations for geographic historic district and land use constitute zoning; (2) the City's historic district zoning laws violate the Houston City Charter; and (3) the City's historic district zoning laws violate the Texas Legislature's Zoning Enabling Act.

Because we conclude that the HPO does not constitute a zoning measure, we affirm the trial court's take-nothing judgment in favor of the City.

## Background

The City is a home-rule city. In 1994, the City amended the City Charter to provide that it may only adopt zoning ordinances after it publishes any proposed ordinance for public hearings and debate during a six-month waiting period and then holds a binding referendum at a regularly scheduled election. Specifically, the Charter was amended to provide:

> The City of Houston shall have the power to adopt a zoning ordinance only by: (a) allowing a six month waiting period after publication of any proposed ordinance for public hearings and debate and (b) holding a binding referendum at a regularly scheduled election. Any existing zoning ordinance is hereby repealed.

The Charter does not define what constitutes a zoning ordinance. The Charter further provides that "no ordinance shall be enacted inconsistent with the provisions of this charter."

In 1995, the City Council adopted the HPO. This ordinance provided for the creation of historic districts and required that property owners in those designated historic districts must apply to the Houston Archeological and Historical Commission (HAHC) for a "certificate of appropriateness" before demolishing, modifying, or developing property situated within a historic district. However, if the HAHC denied a certificate of appropriateness, after a waiting period of ninety days, the property owner was entitled to a "90-day waiver certificate" allowing the owner to make the proposed changes to the property located within the designated historic district without further approval from the HAHC. The HPO was subsequently amended in 2005 to limit the availability of 90-day waiver certificates in certain instances.

The Homeowners own property in Heights East, which was designated as a historic district by a resolution of the City Council on February 19, 2008.

In 2010, the City again amended the HPO (the 2010 amendments). The 2010 amendments included provision that eliminated property owners' right to obtain "90-day waiver certificates" for any property located in a designated historic district and updated guidelines regarding new construction and alteration to both

historic and non-historic structures in the designated historic district, including Heights East.

Also in 2010, the City passed an ordinance (the Transition Ordinance) establishing a one-time "process for the reconsideration of the designation of historic districts," which provided a process for reconsidering whether districts previously designated as historic districts under the rules prior to the 2010 amendments should continue to be governed by the HPO as amended. The reconsideration process was triggered when more than 10% of a historic district's property owners joined in the request, requiring the City's Director of City Planning and Development Department (Director) to consider the request in light of several factors such as the criteria for designation of the historic district, any changed circumstances identified in the request for reconsideration, and the current level of support for the designation of the historic district. The Director was then required to make a recommendation to the City Council, including recommending that the City Council take no action with respect to the designation of the historic district, that it repeal the resolution creating the historic district if the owners of 51 percent of the tracts in the designated historic district indicated that they do not support the continued designation, or that it amend the resolution designating the historic district to reduce its boundaries. The Transition Ordinance further provided that the City Council would consider the Director's recommendation and the

4

criteria considered by the Director in making the recommendation and then decide whether to accept the Director's report and take the recommended action. The Transition Ordinance stated that the City Council's decision shall be final.

Shortly after the Director made the reconsideration form available, more than 10% of property owners in Heights East moved for reconsideration of the neighborhood's status as a designated historic district. The Planning Department mailed each property owner in Heights East notice of a public meeting and a survey regarding whether they supported repeal of Heights East's designation as a historic district. After the deadline for returning the survey had passed, the Director found that, of the 780 tracts in Heights East, only 193 requested repeal of the historic designation. The Director prepared a recommendation to the City Council that it "tak[e] no action with respect to the designation of the historic district." The City Council, in an 8-7 vote, rejected the Director's recommendation as to the Heights East district, but the City Council nevertheless failed to pass any further ordinances or resolutions with respect to Heights East's status as a designated historic district. Thus, the City has continued to apply the HPO, as amended by the 2010 amendments, to Heights East.

In 2014, the Homeowners filed suit seeking a declaratory judgment that the HPO is void and unenforceable because it violates the City Charter's prohibition

5

against zoning and that the HPO violates provisions authorizing municipal zoning as set out in Texas Local Government Code chapter 211.[1]

The case was tried to the bench in February 2018, with the parties noting that the "facts are undisputed and the case concerns pure questions of law." The Homeowners argued that the HPO, as amended in 2010, "is a zoning law that regulates the use of property in designated geographical districts" and, thus, is void because the City Charter prohibits the City from passing "zoning ordinances" except under limited circumstances that the parties agree did not occur here. The Homeowners also asserted that the HPO failed to comply with the requirements of Texas Local Government Code chapter 211.

The Homeowners presented evidence that the City of Houston adopted a "General Plan" in 2015 that describes an overall vision for the City, with the intention of coordinating and informing the development of future plans, policies, and regulations. The plan, called "Plan Houston," includes (1) a vision statement that provides an overview of the City's immediate and long-term objectives for economic development, fiscal responsibility, infrastructure, development, redevelopment, public health, safety, welfare, and quality of life; and

---

[1] The Homeowners also alleged that the HPO should not apply to Heights East because of the results of the reconsideration process some property owners engaged in pursuant to the Transition Ordinance; and they also alleged that the enforcement of the HPO constituted an unconstitutional taking of their property by the City, but the Homeowners do not challenge on appeal the trial court's take-nothing judgment on either of these claims.

(2) implementation and coordination strategies to achieve the objectives of the vision statement. It identifies twelve "Core Strategies" for considering future development, stating:

> In order to achieve the community's vision and goals and to provide for the needs of all Houstonians, the City of Houston will do the following:
>
>> Spend money wisely.
>> Grow responsibly.
>> Sustain quality infrastructure.
>> Nurture safe and healthy neighborhoods.
>> Connect people and places.
>> Support our global economy.
>> Champion learning.
>> Foster an affordable city.
>> Protect and conserve our resources.
>> Communicate clearly and with transparency.
>> Partner with others, public and private.
>> Celebrate what's uniquely Houston.
>
> Greater detail on each Core Strategy, including Actions necessary to implement each strategy, can be found on the following pages. The numbering of actions on the following pages does not indicate priority or importance.

The Plan Houston report identified particular "actions" and "related goals" for each core strategy. For example, under "actions" for "[c]elebrate what's uniquely Houston," the plan listed, among other items, "[m]aintain a plan for supporting arts and culture," "[c]elebrate Houston's past and present diversity and culture through City activities, events and publications," and "[p]reserve historic resources." The plan identified as a "related goal" the need to build "[a]

community that respects its history," and it indicated that an appropriate indicator of the City's performance under this measure is the number of "buildings and sites listed in the National Register of Historic Places, State and or City Historic Designation[s]" and "[s]quare mileage of local historic districts."

By contrast, the City relied on the language of the ordinance itself in arguing that the HPO is not a zoning ordinance. The City introduced into evidence the language of the HPO and its subsequent amendments, asserting that the HPO was not adopted pursuant to a comprehensive plan, nor did it include measures associated with zoning in the sense intended by either the Local Government Code or the City Charter. The City pointed to the relatively small impact the HPO has had on the City as whole. It presented evidence that the City is approximately 670 square miles in size and that the HPO is applicable to a total of approximately 2.4 square miles. The HPO thus applies to approximately 0.4% of the land within the City. Similarly, the City identified approximately 6,706 parcels of land out of the 646,616 individually-platted and individually-owned parcels of land in the City that are located in designated historic districts subject to the HPO. By this calculation, the HPO affects a little more than 1% of the parcels of property in the City. Thus, the City argued that, because it has had such a limited impact throughout the City, the HPO does not constitute zoning pursuant to a comprehensive plan. The City also presented the trial court with evidence of the

sort of comprehensive plans used to implement zoning measures in other municipalities like Austin, Dallas, and San Antonio as a point of contrast with the historic preservation plans of the City of Houston.

The trial court considered the documentary evidence submitted by the parties. It rendered judgment in favor of the City and ordered that the Homeowners take nothing on their claims seeking to invalidate the HPO. This appeal followed.

## Validity of the HPO

In three issues, the Homeowners challenge the validity of the HPO.

### A.    Standard of Review

Ordinances are construed under the same rules of construction applicable to interpreting statutes. *Bd. of Adjustment of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002); *City of Glen Rose v. Reinke*, No. 07-15-00266-CV, 2016 WL 638060, at *3 (Tex. App.—Amarillo Feb. 8, 2016, no pet.) (mem. op.). The construction of statutes or ordinances is a legal question that we review de novo. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008); *City of Glen Rose*, 2016 WL 638060, at *3.

In construing statutes or ordinances, we ascertain and give effect to the legislative body's intent as expressed by the language of the statute. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *see also Safe Water Found. of Tex. v. City of Houston*, 661 S.W.2d 190, 191 (Tex. App.—Houston [1st Dist.] 1983, writ.

9

ref'd n.r.e.) ("The City Council acts as the legislative body of the City[.]"). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired. TEX. GOV'T CODE ANN. § 311.011(b). Otherwise, we construe the statute's or ordinance's words according to their plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results. *See Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); *Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356 (Tex. 2004), *superseded by statute on other grounds*, TEX. GOV'T CODE ANN. § 311.034; *Taylor v. Firemen's and Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981); *see also Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004) (noting that when statutory text is unambiguous, courts must adopt interpretation supported by statute's plain language unless that interpretation would lead to absurd results). We presume the Legislature intended a just and reasonable result by enacting the statute. TEX. GOV'T CODE ANN. § 311.021(3).

"A city ordinance or charter provision is presumed to be valid, and the courts have no authority to interfere unless it is unreasonable and arbitrary, amounting to a clear abuse of municipal discretion." *City of Houston v. Todd*, 41 S.W.3d 289, 295 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *City of*

*Brookside Vill. v. Comeau*, 633 S.W.2d 790, 796 (Tex. 1982), and *Barnett v. City of Plainview*, 848 S.W.2d 334, 338 (Tex. App.—Amarillo 1993, no writ)); *see also In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002) (presuming that home-rule city charter provision is valid and stating that courts cannot interfere unless provision is unreasonable and arbitrary, amounting to clear abuse of municipal discretion). "The party attacking the ordinance bears an 'extraordinary burden' to show 'that no conclusive or even controversial or issuable fact or condition existed' which would authorize the municipality's passage of the ordinance." *City of Brookside Vill.*, 633 S.W.2d at 792–93; *Safe Water Found. of Tex.*, 661 S.W.2d at 192.

**B.      Law Governing Zoning and Other Municipal Exercises of Police Power**

Local Government Code chapter 211 contains provisions governing municipal zoning authority, which the Legislature adopted for the purpose of "promoting the public health, safety, morals, or general welfare and protecting and preserving places and areas of historical, cultural, or architectural importance and significance."   TEX. LOC. GOV'T CODE ANN. § 211.001.   Section 211.004(a) provides:

> Zoning regulations must be adopted in accordance with a comprehensive plan and must be designed to:
>
>> (1) lessen congestion in the streets;
>>
>> (2) secure safety from fire, panic, and other dangers;
>>
>> (3) promote health and the general welfare;

11

(4) provide adequate light and air;

(5) prevent the overcrowding of land;

(6) avoid undue concentration of population; or

(7) facilitate the adequate provision of transportation, water, sewers, schools, parks, and other public requirements.

TEX. LOC. GOV'T CODE ANN. § 211.004(a); *see also id.* § 211.003(a) (providing that governing body of municipality may regulate, among other things, "the height, number of stories, and size of buildings and other structures," population density, groundwater extraction and usage, and "the location and use of buildings, other structures, and land for business, industrial, residential, and other purposes"). Section 211.003(b) further provides: "In the case of designated places and areas of historical, cultural, or architectural importance and significance, the governing body of a municipality may regulate the construction, reconstruction, alteration, or razing of buildings and other structures." *Id.* § 211.003(b).

Section 211.005 provides requirements for zoning districts:

(a) The governing body of a municipality may divide the municipality into districts of a number, shape, and size the governing body considers best for carrying out this subchapter. Within each district, the governing body may regulate the erection, construction, reconstruction, alteration, repair, or use of buildings, other structures, or land.

(b) Zoning regulations must be uniform for each class or kind of building in a district, but the regulations may vary from district to district. The regulations shall be adopted with reasonable

12

consideration, among other things, for the character of each district and its peculiar suitability for particular uses, with a view of conserving the value of buildings and encouraging the most appropriate use of land in the municipality.

*Id.* § 211.005.

The Local Government Code likewise includes provisions for administering zoning ordinances, such as provisions setting out the procedures by which municipalities may adopt zoning measures, including requirements for notice and public hearings; the directive to create a "zoning commission" to "exercise the powers authorized by this subchapter"; and the authorization to create a board of adjustment "to make special exceptions to the terms" of any zoning ordinance created. *Id.* §§ 211.006–.008. Section 211.012 provides that a municipality "may adopt ordinances to enforce this subchapter or any ordinance or regulation adopted under this subchapter," setting out penalties and remedies that apply. *Id.* § 211.012.

Section 211.015 further provides:

(a) Notwithstanding other requirements of this subchapter, the voters of a home-rule municipality may repeal the municipality's zoning regulations adopted under this subchapter by either:

(1) a charter election conducted under law; or

(2) on the initial adoption of zoning regulations by a municipality, the use of any referendum process that is authorized under the charter of the municipality for public protest of the adoption of an ordinance.

13

*Id.* § 211.015.

Chapter 213 governs "municipal comprehensive plans." Section 213.002 provides:

(a) The governing body of a municipality may adopt a comprehensive plan for the long-range development of the municipality. A municipality may define the content and design of a comprehensive plan.

(b) A comprehensive plan may:

(1) include but is not limited to provisions on land use, transportation, and public facilities;

(2) consist of a single plan or a coordinated set of plans organized by subject and geographic area; and

(3) be used to coordinate and guide the establishment of development regulations.

(c) A municipality may define, in its charter or by ordinance, the relationship between a comprehensive plan and development regulations and may provide standards for determining the consistency required between a plan and development regulations.

*Id.* § 213.002; *see also id.* § 213.003 (setting out procedures for adoption or amendment of comprehensive plan). Section 213.004 expressly states that "[t]his chapter does not limit the ability of a municipality to prepare other plans, policies, or strategies as required." *Id.* § 213.004.

Notwithstanding the grant of authority provided by Local Government Code chapter 211, it is generally recognized that home-rule cities, like the City here, have authority to place additional conditions on zoning regulation. For example,

14

Local Government Code section 51.072 provides generally that "[t]he municipality has full power of local self-government" and that "[t]he grant of powers to the municipality by this code does not prevent, by implication or otherwise, the municipality from exercising the authority incident to self-government." *Id.* § 51.072. The Texas Supreme Court has likewise recognized that home-rule municipalities, like the City, possess "the full power of local self-government" and look to the legislature not for grants of authority but only for limitations on the City's own authority. *BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016) (citing TEX. LOC. GOV'T CODE ANN. § 51.072).

Thus, the City amended the City Charter in 1994 to limit its authority to create zoning ordinances:

> The City of Houston shall have the power to adopt a zoning ordinance only by: (a) allowing a six month waiting period after publication of any proposed ordinance for public hearings and debate and (b) holding a binding referendum at a regularly scheduled election. Any existing zoning ordinance is hereby repealed.

Houston, Tex., CITY CHARTER art VII, § 12 (1994).

In connection with this authority of self-government and the right of a home-rule municipality to use its inherent police powers, courts have recognized that not all regulation of land use constitutes zoning as contemplated by either the City Charter or Local Government Code chapter 211. The Texas Supreme Court and other courts have acknowledged a distinction between zoning ordinances enacted

15

pursuant to a comprehensive plan and other ordinances or measures that regulate land use pursuant to a home-rule city's general police powers. *City of Brookside Vill.*, 633 S.W.2d at 792, 793 & n.4; *City of Houston v. Johnny Frank's Auto Parts Co.*, 480 S.W.2d 774, 776–78 (Tex. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.). Building codes, park regulation, nuisance claims, and other such measures may impact land use, but generally are not considered zoning measures. *See Town of Lakewood Vill. v. Bizios*, 493 S.W.3d 527, 531 (Tex. 2016) (stating that home-rule municipalities inherently possess authority to adopt and enforce building codes absent express limitation on this authority); *Severance v. Patterson*, 370 S.W.3d 705, 710 (Tex. 2012) (recognizing that governmental entity has authority to place limitations on property rights through nuisance claims as exercise of police power); *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex. 1984) (noting, in context of challenge to ordinance requiring real estate developers to include dedicated park land in their plans, that all property is held subject to valid exercise of police power; that city may enact reasonable regulations to promote health, safety, and general welfare of its people; and that numerous jurisdictions have upheld park land dedication ordinances as legitimate exercises of police power); *see also Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388–89 (1926) (recognizing generally-accepted nature of "laws and regulations fixing the height of buildings within reasonable limits, the character of

16

materials and methods of construction, and the adjoining area which must be left open, in order to minimize the danger of fire or collapse, the evils of overcrowding and the like, and excluding from residential sections offensive trades, industries and structures likely to create nuisances"; contrasting such laws with zoning ordinance that excluded "in general terms all industrial establishments" regardless of whether such business were offensive or dangerous).

In *City of Brookside Village*, the parties conceded that the ordinances in question—ordinances restricting permissible locations of mobile homes used as residences—were "essentially zoning or land use ordinances," so the supreme court did not consider whether the ordinances constituted zoning. 633 S.W.2d at 792–93. The supreme court stated that because the ordinances had "the effect of a zoning regulation," their validity was "to be scrutinized under . . . principles relating to a municipality's exercise of general police power." *Id.* at 793. However, the supreme court also noted that the ordinances in question did not implicate the predecessor to chapter 211, Revised Civil Statutes article 1011c, governing municipal zoning authority:

> Because Brookside Village, a general law city, has no comprehensive zoning plan, the ordinances in question do not come under article 1011a, which embodies legislative authorization for zoning. *See* TEX. REV. CIV. STAT. ANN. art 1011c (zoning power must be exercised under comprehensive plan). A city, however, may regulate land use under its general police powers.

*Id.* at 793 n.4.

17

Likewise, in *Johnny Frank's Auto Parts Co.*, the Fourteenth Court of Appeals upheld the validity of an ordinance regulating the operation of automotive wrecking and salvage yards within the City. The ordinance in *Johnny Frank's Auto Parts* required, among other things, that all flammable liquids be drained from wrecked automobiles within city limits, that wrecking yards be surrounded by a solid fence or wall, that walls be at least six feet high or, where generally parallel to and within 100 feet of a street right-of-way, at least eight feet high, and it prohibited the display of or working on wrecked vehicles outside of the required walls. 480 S.W.2d at 775. In considering the validity of the ordinance, which was adopted pursuant to the City's police power to regulate land use, the court stated:

> The ordinance with which this case is concerned is not a zoning ordinance. It does not establish a comprehensive plan by which the city is divided into districts wherein property is limited to specified uses and it was not passed in accordance with the procedures specified for the passage of zoning ordinances. This ordinance does not prohibit any particular use of any property, but merely regulates the use of property in the operation of an automobile wrecking or salvage yard. It is, however, somewhat akin to a zoning ordinance in that it is an exercise of the city's police power.

*Id.* at 778. The Fourteenth Court held that, because there was some evidence to support the City's determination that such regulation of wrecking yards served to protect the health, safety, and welfare of the city's inhabitants, the enactment of the ordinance was a constitutional exercise by the City of its police powers. *Id.* 778–79.

18

In *N.W. Enterprises, Inc. v. City of Houston*, the plaintiffs—owners and operators of certain sexually-oriented business—argued that a City ordinance imposing locational restrictions on sexually-oriented businesses constituted a zoning regulation and was therefore invalid because it had not been adopted pursuant to the City Charter's requirements for adopting zoning ordinances. 27 F. Supp. 2d 754, 795 (S.D. Tex. 1998), *aff'd in part, rev'd in part, dism'd in part*, 352 F.3d 162 (5th Cir. 2003), *on reh'g in part*, 372 F.3d 333 (5th Cir. 2004).[2] The court in *N.W. Enterprises* recognized that the City Charter did not define "zoning," but it looked to both case law and "a plain meaning analysis" to conclude that "the use of the word 'zoning' in the 1994 Charter amendment refers to the context of a more comprehensive plan than is provided by the locational restrictions on sexually oriented businesses" set out in the ordinance in that case. *Id.* at 795–96 (citing *City of Brookside Vill.*, 633 S.W.2d at 790, *MJR's Fare of Dallas v. City of*

---

[2]   The Fifth Circuit expressly approved the district court's analysis of whether the ordinance in that case constituted zoning: "This ordinance is no zoning regulation. The district court thoroughly and completely rejected this argument." *N.W. Enters., Inc. v. City of Houston*, 352 F.3d 162, 178 (5th Cir. 2003). Like the district court, the Fifth Circuit cited *City of Brookside Village*, stating, "[W]hile the Texas Supreme Court characterized certain ordinances, which restricted the permissible locations of mobile homes, as 'hav[ing] the effect of a zoning regulation,' the court also held that the regulations were not 'zoning regulations.'" *Id.* (citing 633 S.W.2d 790, 793 n.4 (Tex. 1982)). The Fifth Circuit held that the plaintiff challenging the ordinance "cites no authority to support its argument that prohibiting adult businesses from locating within 1,500 feet of churches, schools, day care centers, parks, and residential areas would produce hundreds of 162–acre regulated areas and would effectively comprise a comprehensive land use plan tantamount to zoning." *Id.*

*Dallas*, 792 S.W.2d 569, 573 (Tex. App.—Dallas 1990, writ denied), and *Johnny Frank's Auto Parts Co.*, 480 S.W.2d at 778). The district court in *N.W. Enterprises* considered the Texas Supreme Court's opinion in *City of Brookside Village* as noting "the possible distinction between a zoning ordinance and a less comprehensive regulation of land use." *Id.* at 796. It stated:

> By noting that, under the relevant state statute, "zoning" power must be exercised under a comprehensive plan, the Texas Supreme Court clearly envisioned in this footnote that more specific locational restrictions, enacted under the City's general police powers and not under the authority of the state zoning statute, do not constitute "zoning" but are instead merely examples of other types of municipal regulation of land use.

*Id.* (citing *City of Brookside Vill.*, 633 S.W.2d at 793 n.4).

The district court in *N.W. Enterprises* examined other state cases and the definition of "zoning" in Black's Law Dictionary and concluded that "the 'ordinary, contemporary, common meaning' of zoning refers to a comprehensive plan and encompasses regulations that establish affirmatively what land uses are permissible for certain geographic districts, not simply what uses are *not* permissible." *Id.* at 797 (citing BLACK'S LAW DICTIONARY 1618 (6th ed. 1990) (defining zoning as "[t]he division of a city or town by legislative regulation into districts and the prescription and application in each district of regulations having to do with structural and architectural designs of buildings and of regulations prescribing use to which buildings within designated districts may be put" and

20

"[d]ivision of land into zones, and within those zones, regulation of both the nature of land usage and the physical dimensions of uses including height setbacks and minimum area")).

## C. The HPO's Status as a "Zoning" Ordinance

In their first issue on appeal, the Homeowners argue that the HPO constitutes a zoning law. The remainder of their complaints on appeal—that the HPO was enacted in violation of the City Charter's provisions regarding zoning ordinances and in violation of the zoning regulations set out by the Texas Legislature—turn on the answer to this question.

In response to the Homeowners' argument that the HPO, as amended in 2010, and its related regulations for historic districts constitute zoning or de facto zoning, the City argues that the HPO was expressly enacted pursuant to the City's home-rule general police power and is not a zoning ordinance as contemplated by either the City Charter or Local Government Code chapter 211. The trial court agreed with the City, and so do we. The purposes for which the HPO was created, the function that it serves, and the regulations of property use and development are different from those implicated by zoning laws as contemplated by the Local Government Code, case law, and the City Charter.

Both Local Government Code chapter 211 and the relevant case law recognize that the purpose behind the institution of zoning laws is to aid in

21

community planning. The supreme court stated that "[z]oning regulation is a recognized tool of community planning, allowing a municipality, in the exercise of its legislative discretion, to restrict the use of private property." *City of Brookside Vill.*, 633 S.W.2d at 792. Local Government Code section 211.004 provides that "zoning regulations must be adopted in accordance with a comprehensive plan and must be designed to" meet certain community-planning needs such as lessening congestion, securing safety, preventing overcrowding or undue concentration of population, or facilitating the adequate provision of public services. TEX. LOC. GOV'T CODE ANN. § 211.004.

By contrast, the ordinance through which the City Council enacted the 2010 amendments to the HPO provided that "the quality and character of a city is not merely its hope for the future development, but also its retention of the elements of its past," that "the demolition of historical, cultural and archaeological resources constitutes an irreplaceable loss to the City," that the HPO was adopted to provide "for the recognition, protection, enhancement, perpetuation and use of sites, landmarks and areas of historical or archeological interest within the City," and that the HPO "is necessary and appropriate and is in the public interest as a means to preserve and protect the historic heritage of the City and to protect and promote the health and economic well-being, safety and welfare of the people of the City."

22

The HPO allows for the City itself, through the HAHC, or for a percentage of property owners within a potential historic district, to seek designation of historic districts "containing a significant percentage of . . . structures" that contribute to the historic character of the area. The HPO provides the procedures by which such applications should be considered and lists factors to be considered, such as whether the area "possesses character, interest or value as a visible reminder of the development, heritage, and cultural and ethnic diversity of the city, state, or nation," whether the area or site "is the location of a significant local, state, or national event," or whether the buildings in the area "exemplify a particular architectural style or building type important to the city" or otherwise constitute "the best remaining examples of an architectural style or building type in a neighborhood."[3]

The HPO requires that property owners in designated historic districts apply to the HAHC for a "certificate of appropriateness" before demolishing, modifying, or developing property situated within a historic district, except in certain enumerated instances, such as when the property owner is doing ordinary maintenance and repair. Finally, it provides style and aesthetic guidelines for buildings in the historic district to facilitate applications for certificates of appropriateness.

---

[3] *See* Chapter 33, Article 7 of the City of Houston Code of Ordinances, for the text of the HPO as amended.

However, nothing in the ordinance addresses building usage or identifies building "classes" or types specifically. In fact, the scope of the HPO states that it applies only to the "alteration, rehabilitation, restoration, construction, relocation and demolition of any building, structure, object or site" located in a designated historic district. It expressly states, "Nothing in this article shall be construed to authorize the city to regulate the use of any building, structure or property," and it states, "Nothing in this article shall be construed to authorize the city to regulate the interior characteristics of any building or structure" so long as any alteration or use of the interior does not affect the outward appearance of the building. Furthermore, because of the ordinance's focus on exterior character and appearance of the buildings, nothing in the HPO addresses any measures traditionally considered in zoning regulations, such as planning for future development, prevention of overcrowding, avoidance of undue concentration of population, or facilitation of the adequate provision of public services. *See* TEX. LOC. GOV'T CODE ANN. § 211.004 (providing that zoning regulations must be adopted in accordance with comprehensive plan and must be designed to lessen congestion, secure public safety, promote health and general welfare, provide adequate light and air, prevent overcrowding, avoid undue concentration of population, or facilitate provision of public services).

Thus, considering the plain language of the ordinance, the purpose and function of the HPO as amended is primarily to protect and preserve areas of historical significance in isolated areas of the City. It does not contain any provisions implementing a comprehensive plan for community development that would implicate zoning regulations. *See City of Sunset Valley*, 146 S.W.3d at 642 (construing statute's words according to their plain and common meaning); *Wende*, 92 S.W.3d at 430 (construing ordinance under same rules of construction applicable to interpreting statutes).

The Homeowners argue that, because of the type of regulation it permits, the HPO constitutes de facto zoning. They assert that the design guidelines and procedures for obtaining a certificate of appropriateness are detailed and effectively allow the City to regulate aspects of the property such as building height and size, the percentage of lots that can be used for improvements, or the amount of open space available. The Homeowners further argue that the HPO is fundamentally a zoning law because it regulates building requirements by creating geographic districts. They assert that, because the HPO permits the City to create districts that are subject to different procedural and substantive land use rules, it implicates the City's municipal authority to regulate local land use on the basis of its zoning power.

However, the plain language of the HPO as amended indicates that it does not divide the City into geographically-based zoning districts for the purpose of community planning. *See* TEX. LOC. GOV'T CODE ANN. § 211.005(a) (providing that governing body of municipality may "divide the municipality into districts" that it "considers best for carrying out this subchapter"). The HPO does not identify classes or kinds of buildings within a district or zone, nor does it provide "uniform" regulations that apply across districts of a particular type for future development. *See id.* § 211.005(b) (providing that "[z]oning regulations must be uniform for each class or kind of building in a district, but the regulations may vary from district to district").

Rather than creating regulations based on geographic district, the HPO's regulations are based on the historic significance of a small number of neighborhoods and provides for the creation of historic districts out of areas where there are already-existing concentrations of historically significant structures or land. It allows those areas to be designated as historic districts after a period of evaluation by the HAHC and public input, and it institutes special building guidelines and permitting procedures for altering the existing buildings or engaging in new building projects.

The HPO guidelines impact the outer appearance and historical character of the properties within the designated districts. It states that plans for changes or

improvements must "retain and preserve the historical character of the property" and must "recognize the building, structure, object or site as a product of its own time and avoid alterations that seek to create an earlier or later appearance." It provides that property owners are entitled to a certificate of appropriateness if the proposed alterations meet enumerated criteria, such as new structures not being taller that the existing structure or having similar roof pitch and materials. As the City points out, "These types of protections are property-specific and involve review [on a case-by-case basis] by the Director or review and approval by the HAHC." These types of individualized regulations are distinguishable from zoning regulations, which require that all buildings of a particular class or kind within a zoning district be subject to uniform regulations. *See id.*

The Homeowners further argue that the City adopted the HPO as part of its "General Plan," i.e., the Plan Houston initiative. However, the Plan Houston report is not a "comprehensive plan" as contemplated by chapter 211 and defined by chapter 213. The Plan Houston report was adopted in 2015, twenty years after the HPO was originally passed and five years after the 2010 amendments to the HPO. Thus, the HPO could not have been "adopted in accordance with" this plan, as required by Local Government Code section 211.004. *See id.* § 211.004 (providing that zoning regulations must be adopted in accordance with comprehensive plan).

27

Furthermore, the Plan Houston report is not a "comprehensive plan" as contemplated by the Local Government Code. Plan Houston is a list of general aspirational goals, such as to "[c]elebrate what's uniquely Houston" by maintaining "a plan for supporting arts and culture," celebrating "Houston's past and present diversity and culture through City activities, events and publications," and preserving "historic resources." The Plan Houston report does not include any affirmative provisions on land use, transportation, or public facilities. *See id.* § 213.002 (describing "comprehensive plan" as required for zoning purposes). Although the legislature did not specifically define "comprehensive plan," it does provide that municipal comprehensive plans may be adopted "for the long-range development" of a municipality and that it may "include but is not limited to provisions on land use, transportation, and public facilities" and may "consist of a single plan or a coordinated set of plans organized by subject and geographic area." *Id.* § 213.002(a), (b)(1)–(2). This description, when combined with the provision in section 211.004, which states that "[z]oning regulations must be adopted in accordance with a comprehensive plan and must be designed to" accomplish city-planning tasks such as "lessen[ing] congestion in the streets" and "facilitat[ing] the adequate provision of transportation, water, sewers, schools, parks, and other public requirements," indicates that a "comprehensive plan" must be something more than a list of aspirational goals. *See id.* § 211.004.

The comprehensive plans of other municipalities, like Austin, Dallas, and San Antonio, introduced into evidence by the City, likewise support a conclusion that neither the Plan Houston initiative nor the historic preservation measures contained in the HPO constitute a comprehensive plan as contemplated for zoning purposes. The comprehensive plan of the City of Austin, for example, divided the majority of the city into clearly identified districts with specifically delineated uses, i.e., residential, commercial, industrial, and special-use or combined-use districts. The plan provided further guidance as to specific uses within each district—for example, the plan identified sixteen potential "residential" uses and identified the particular residential districts where those uses were permitted. This is distinguishable from a plan like the Plan Houston report that contains only generally aspirational guidelines.

There is also no evidence that the HPO applies to the City in a comprehensive manner. To the contrary, the HPO applies to approximately 0.4% of the total land within the City and approximately 1% of the individually-platted and owned parcels of land in the City. It does not address City-wide, community planning concerns such as lessening congestion, securing safety, controlling population density, or facilitating the adequate provision of public services. *See id.*; *City of Brookside Vill.*, 633 S.W.2d at 792 ("Zoning regulation is a recognized tool

of community planning, allowing a municipality, in the exercise of its legislative discretion, to restrict the use of private property.").

The Homeowners also appear to argue that the HPO's failure to comport with the requirements of chapter 211 demonstrates that it is a failed, invalid attempt at zoning. This line of thinking disregards the City's home-rule authority to manage building codes, permitting, and land use as a power distinct from any authority to pass more comprehensive zoning ordinances. *See BCCA Appeal Grp.*, 496 S.W.3d at 7 (holding that home-rule municipalities possess "the full power of self-government" and look to legislature not for grants of authority but only for limitations on their authority); *see also, e.g.*, *Bizios*, 493 S.W.3d at 531 (stating that home-rule municipalities inherently possess authority to adopt and enforce building codes absent express limitation on this authority); *Severance*, 370 S.W.3d at 710 (recognizing municipalities' authority to place limitations on land use as exercise of police power). Considered in this light, the HPO is not a failed attempt at comprehensive zoning, but rather an exercise of the City's inherent authority to regulate land use in more narrow circumstances.[4]

In *City of Brookside Village*, the Texas Supreme Court recognized that there was overlap between zoning and a more specialized exercise of police power to

---

[4]     The Homeowners do not argue on appeal that the HPO is an invalid or improper exercise of the City's police power or other inherent authority to regulate land use. They argue only that it constitutes improper zoning.

30

regulate land use. 633 S.W.2d at 792–93. Nevertheless, it created a distinction between the specific ordinance restricting permissible locations of mobile homes and zoning measures enacted as part of a comprehensive plan. *Id.* at 793 n.4 (noting that Brookside Village had no comprehensive zoning plan so ordinances in question did not fall under legislative authorization for zoning, but that city "may regulate land use under its general police powers"); *see also N.W. Enters., Inc. v. City of Houston*, 352 F.3d 162, 178 (5th Cir. 2003) ("[W]hile the Texas Supreme Court characterized certain ordinances, which restricted the permissible locations of mobile homes, as 'hav[ing] the effect of a zoning regulation,' the court also held that the regulations were not 'zoning regulations.'").

The Fourteenth Court of Appeals has likewise recognized that an ordinance regulating the operation of automotive wrecking and salvage yards impacted land and was "somewhat akin to a zoning ordinance in that it is an exercise of the city's police power." *Johnny Frank's Auto Parts Co.*, 480 S.W.2d at 778. The court nevertheless drew a distinction between zoning and less comprehensive exercises of authority to regulate land use:

> The ordinance with which this case is concerned is not a zoning ordinance. It does not establish a comprehensive plan by which the city is divided into districts wherein property is limited to specified uses and it was not passed in accordance with the procedures specified for the passage of zoning ordinances. This ordinance does not prohibit any particular use of any property, but merely regulates the use of property in the operation of an automobile wrecking or salvage yard.

31

*Id.*

Similar to the ordinance in *Johnny Frank's Auto Parts Co.*, the HPO does not establish a comprehensive plan dividing the City into districts wherein property is limited to specific uses and it was not passed in accordance with the procedures specified for the passage of zoning ordinances. *See id.* The HPO expressly does not prohibit "any particular use of property," but regulates a narrower aspect of the property usage—i.e., the outward, exterior appearance of structures in certain designated historic districts to the extent necessary to preserve their historic character. *See id.*

The Homeowners acknowledge that "[m]unicipalities can make regulations that affect land use under home-rule police powers," but they argue that the HPO is "so pervasive and so inherently tied to geographic districting as to fall within the definitions set forth in the Zoning Enabling Act (such as regulating size, location, structure, and aesthetics of 'areas' of 'historical' significance, § 211.003(b))." They cite *Mayhew v. Town of Sunnyvale* for the proposition that local governments may not "ignore the requirements mandated by the Texas Zoning Enabling Act when it undertakes zoning." 774 S.W.2d 284, 293–94 (Tex. App.—Dallas 1989, writ denied) (concluding that ordinances are invalid where "the express, mandatory provisions of our zoning statute have not been complied with"). *Mayhew* is distinguishable in several material ways—primarily because, in that case, "it [was]

32

undisputed that the town has a comprehensive plan, that it ha[d] had such a plan since 1965, that the regulations at issue [were] 'zoning' regulations, and indeed, that the town's zoning ordinance expressly provide[d] that it was *made in accordance with a comprehensive zoning plan.*"  *Id.* at 294. None of those circumstances are present here—the Homeowners failed to identify a comprehensive plan either existing now or at the time the HPO was passed, the City contends that the HPO does not constitute zoning, and nothing in the HPO indicates that it was made in accordance with a comprehensive plan or that the HPO itself is comprehensive in nature. Thus, *Mayhew* is inapplicable here.

Rather, the reasoning in the federal district court's opinion in *N.W. Enterprises* supports our conclusion that, contrary to the Homeowners' assertions, the HPO is neither "pervasive" nor "so inherently tied to geographic districting" as to fall within the provisions for zoning regulations under Local Government Code chapter 211 or the City Charter. In that case, the court considered an ordinance limiting the locations in which sexually-oriented businesses could operate. 27 F. Supp. 2d at 795. The court considered case law and "a plain meaning analysis" to conclude that "the use of the word 'zoning' in the 1994 Charter amendment [limiting the City's authority to enact zoning ordinances] refers to the context of a more comprehensive plan than is provided by locational restrictions on sexually oriented businesses." *Id.* at 795–96. It concluded that "the 'ordinary, contemporary,

33

common meaning' of zoning refers to a comprehensive plan and encompasses regulations that establish affirmatively what land uses are permissible for certain geographic districts, not simply what uses are *not* permissible." *Id.* at 797.

We adopt this reasoning in the present case and conclude that, under the cases discussed here, including *City of Brookside Village* and *Johnny Frank's Auto Parts Co.*, the "zoning" provisions in the City Charter and chapter 211 refer to a tool of community planning exercised in the context of a more comprehensive plan than that provided by the HPO's protections for the historic character of a few small sections of the City. *See* Tex. Loc. Gov't Code Ann. § 211.004 (zoning must be adopted in accordance with comprehensive plan and must be designed to meet enumerated city-planning objectives); *City of Brookside Vill.*, 633 S.W.2d at 792 ("Zoning regulation is a recognized tool of community planning, allowing a municipality, in the exercise of its legislative discretion, to restrict the use of private property.").

The Homeowners correctly note that historical preservation may be encompassed within more comprehensive zoning laws and that some jurisdictions' zoning laws include protections for historical preservation. *See* Tex. Loc. Gov't Code Ann. § 211.001 (stating that purpose of zoning authority statute was "promoting the public health, safety, morals, or general welfare and protecting and preserving places and areas of historical, cultural, or architectural importance and

significance"); *id.* § 211.003(b) ("In the case of designated places and areas of historical, cultural, or architectural importance and significance, the governing body of a municipality may regulate the construction, reconstruction, alteration, or razing of buildings and other structures."). However, the fact that historic preservation districts are sometimes incorporated into a city's zoning laws does not make all historic preservation efforts zoning in all instances. Nothing in the authorities cited by the Homeowners indicates that historical preservation may only be accomplished through zoning measures.

As discussed above, courts have acknowledged a distinction between zoning ordinances enacted pursuant to a comprehensive plan and other ordinances or measures that regulate land use pursuant to a home-rule city's general police powers. *See City of Brookside Vill.*, 633 S.W.2d at 793 n.4 ("A city, however, may regulate land use under its general police powers."); *Johnny Frank's Auto Parts Co.*, 480 S.W.2d at 776–78. And as a home-rule city, the City "has full power of local self-government." *See* TEX. LOC. GOV'T CODE ANN. § 51.072(a); *BCCA Appeal Grp.*, 496 S.W.3d at 7. The Homeowners have presented no authority indicating that the legislature's grant of authority to pass zoning laws displaces a city's inherent authority to engage in more limited land-use regulation, nor could we find any. To the contrary, the legislative grant of zoning authority to municipalities in chapter 211 "does not prevent, by implication or otherwise, the

35

municipality from exercising the authority incident to self-government." *See* TEX. LOC. GOV'T CODE ANN. § 51.072(b); *City of Brookside Vill.*, 633 S.W.2d at 792, 793 & n.4; *see also City of Coll. Station*, 680 S.W.2d at 804–05 (noting that all property is held subject to city's valid exercise of police power and that city may enact reasonable regulations to promote health, safety, and general welfare of its people).

We conclude that the Homeowners failed to sustain their burden to show that the HPO was an improper zoning ordinance. *See City of Brookside Vill.*, 633 S.W.2d at 792–93 ("The party attacking the ordinance bears an 'extraordinary burden' to show 'that no conclusive or even controversial or issuable fact or condition existed' which would authorize the municipality's passage of the ordinance."); *Todd*, 41 S.W.3d at 295 (holding that city ordinance is presumed valid and courts have no authority to interfere unless it is arbitrary or unreasonable or otherwise amounts to clear abuse of municipal discretion).

Accordingly, we overrule the Homeowners' first issue on appeal.

Because we have concluded that the HPO is not a zoning ordinance, we likewise conclude that it does not violate the City Charter's limitations on the City's zoning power or the provisions of chapter 211. We overrule the Homeowners' second and third issues.

## Conclusion

We affirm the judgment of the trial court.

                                        Evelyn V. Keyes
                                        Justice

Panel consists of Justices Keyes, Higley, and Landau.